No. 22-2889

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

*IN RE:* BROILER CHICKEN ANTITRUST LITIGATION

END USER CONSUMER PLAINTIFF CLASS,
Plaintiffs-Appellees
v.
FIELDALE FARMS CORPORATION, et al.,
Defendants.

APPEAL OF: JOHN ANDREN,
Objector-Appellant.

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:16-cv-08637
Judge Thomas M. Durkin

Opening Brief and Required Short Appendix
of Appellant John Andren

HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
Theodore H. Frank
1629 K St. NW, Suite 300
Washington, D.C. 20006
(703) 203-3848
ted.frank@hlli.org
*Attorneys for Objector-Appellant*
  *John Andren*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2889

Short Caption: In re: Broiler Chicken Antitrust Litigation

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

John Andren

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Hamilton Lincoln Law Institute

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Theodore H. Frank            Date: October 28, 2022

Attorney's Printed Name: Theodore H. Frank

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ✓    No ☐

Address: 1629 K St NW Suite 300

Washington, DC 20006

Phone Number: 703-203-3848            Fax Number: N/A

E-Mail Address: ted.frank@hlli.org

rev. 12/19 AK

i

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2889

Short Caption: In re: Broiler Chicken Antitrust Litigation

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

John Andren

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Hamilton Lincoln Law Institute

(3)     If the party, amicus or intervenor is a corporation:

     i)     Identify all its parent corporations, if any; and

          N/A

     ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

          N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ M. Frank Bednarz       Date: October 28, 2022

Attorney's Printed Name: M. Frank Bednarz

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☑  No ☐

Address: 1145 E. Hyde Park Blvd. Unit 3A

Chicago, IL 60615

Phone Number: 801-706-2690       Fax Number: N/A

E-Mail Address: frank.bednarz@hlli.org

rev. 12/19 AK

# Table of Contents

Circuit Rule 26.1 Disclosure ................................................................ i

Table of Contents .......................................................................... iii

Table of Authorities ....................................................................... v

Statutes, Regulations, and Rules ......................................................... xi

Jurisdictional Statement ................................................................ 1

Statement of the Issues .................................................................. 2

Standard of Review ...................................................................... 4

Statement of the Case ................................................................... 4

    A.    A direct-purchaser antitrust suit against chicken producers inspires copycat lawsuits by Class Counsel, whom the court appoints to represent the End-User class. ................................................... 5

    B.    Litigation on behalf of all three classes proceeds in tandem, and the Antitrust Division intervenes. ................................................. 6

    C.    Settlements with certain defendants. ......................................... 6

    D.    Direct Plaintiffs' counsel move for and receive an interim fee award of 33⅓%. ...................................................................... 7

    E.    John Andren objects and serves limited discovery. ........................... 8

    F.    The district court overrules Andren's objections and awards a fee percentage greater than class counsel requested. ........................... 12

Summary of the Argument .............................................................. 13

Argument ............................................................................... 15

I.    The district court misapplied Seventh Circuit law. ................................. 15

    A.    Offers of actual competitive bids constitute the best available evidence of the hypothetical *ex ante* bargain between the class and their attorneys. ................................................................... 17

        1.    Hagens Berman's *ex ante* proposals employed declining percentages for large recoveries and early settlement. ...................... 19

        2.    *Ex post* fee awards provide vastly inferior evidence of the hypothetical *ex ante* market rate. ...................................... 22

        3.    Class counsel's own past fee bids and requests show that a 33⅓% award substantially over-compensates lawyers at the expense of the class. ................................................................... 24

    B.    Hagens Berman's bids should not have been disregarded by the district court. .................................................................................. 26

        1.    *Synthroid I* did not reject declining percentages for large tiers of recovery—a structure that class counsel themselves have competitively bid in other cases—and instead promulgated such a scale as a template, going on to mandate that structure in *Synthroid II*. ............................................................................ 28

        2.    The district court errs in dismissing bids not much older than this litigation. ............................................................................ 30

        3.    The bids concerned litigation similar enough to provide insight that an undifferentiated 33⅓% fee award exceeds market rates. ................... 31

    C.    The district court inappropriately disregards out-of-circuit fee awards. .. 35

II.    The district court erred by considering purported expert reports submitted by other parties without notice to class members in this settlement, and without considering Andren's criticisms or permitting Andren discovery. ......... 40

Conclusion .................................................................................................... 43

Statement Regarding Oral Argument ................................................................ 45

Certificate of Compliance with Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 30(d) ......... 46

Proof of Service ............................................................................................. 47

# Table of Authorities

<u>Cases</u>

*In re Amino Acid Lysine Antitrust Litig.,*
    918 F. Supp. 1190 (N.D. Ill. 1996) ...............................................................25

*Belleville Catering Co. v. Champaign Mkt. Place, LLC,*
    350 F.3d 691 (7th Cir. 2003) .......................................................................33

*Bernstein v. Bernstein Litowitz Berger & Grossmann LLP,*
    814 F.3d 132 (2d Cir. 2016) ........................................................................41

*Birchmeier v. Caribbean Cruise Line, Inc.,*
    896 F.3d 792 (7th Cir. 2018) ....................................................................1-2

*In re Broiler Chicken Antitrust Litig.,*
    2017 WL 4417447, 2017 U.S. Dist. LEXIS 160411
    (N.D. Ill. Sep. 28, 2017) ...............................................................................34

*Budinich v. Becton Dickinson & Co.,*
    486 U.S. 196 (1988)..........................................................................................1

*Burkhart v. Washington Metro. Area Transit Auth.,*
    112 F.3d 1207 (D.C. Cir. 1997) ..................................................................41

*In re Capital One TCPA Litig.,*
    80 F. Supp. 3d 781 (N.D. Ill. 2015) ....................................................24, 30

*In re Comdisco Sec. Litig.,*
    150 F. Supp. 2d 943 (N.D. Ill. 2001) ...................................................24, 25

*In re Cendant Corp. Litig.,*
    264 F.3d 201 (3d Cir. 2001) .......................................................................42

*In re Continental Ill. Sec. Litig.*,
  962 F.2d 566 (7th Cir. 1992) ............................................................... 17-18, 23

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC*,
  662 F.3d 913 (7th Cir. 2011) .........................................................................23

*Devlin v. Scardelletti*,
  536 U.S. 1 (2002).............................................................................................2

*Fresno County Employees' Ret. Ass'n v. Isaacson/Weaver Family Trust*,
  925 F.3d 63 (2d Cir. 2019) ...................................................................... 21-22

*Gaskill v. Gordon*,
  160 F.3d 361 (7th Cir. 1998) .........................................................................17

*Grussgott v. Milwaukee Jewish Day Sch., Inc.*,
  882 F.3d 655 (7th Cir. 2018) .........................................................................41

*Gunter v. Ridgewood Energy Corp.*,
  223 F.3d 190 (3d Cir. 2000) ...................................................................... 21-22

*Laffitte v. Robert Half Internat. Inc.*,
  376 P.3d 672 (Cal. 2016) ...............................................................................24

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  No. 11 MD 2262 (NRB), 2020 WL 6891417, 2020 U.S. Dist. LEXIS 220369
  (S.D.N.Y. Nov. 24, 2020) ...............................................................................37

*In re Lithium Ion Batteries Antitrust Litig.*,
  Nos. 21-15120, 21-15200, 2022 U.S. App. LEXIS 31616 (9th Cir. Nov. 16,
  2022) ...................................................................................................... 20-21, 22

*In re Mercury Interactive Corp. Sec. Litig.*,
  618 F.3d 988 (9th Cir. 2010) .........................................................................40

*In re Optical Disk Drive Prods. Antitrust Litig.,*
    No. 10-md-2143, 2010 U.S. Dist. LEXIS 146768 (N.D. Cal. June 4, 2010)..........25, 27

*In re Optical Disk Drive Prods. Antitrust Litig.,*
    959 F.3d 922 (9th Cir. 2020) ............................................................20, 24, 41

*In re Optical Disk Drive Prods. Antitrust Litig.,*
    No. 21-16291, 2022 U.S. App. LEXIS 15571 (9th Cir. Jun. 6, 2022)..........................20

*Redman v. RadioShack Corp.,*
    768 F.3d 622 (7th Cir. 2014) .............................................................3, 14, 40

*In re Resistors Antitrust Litig.,*
    No. 3:15-cv-03820, 2020 U.S. Dist. LEXIS 86492 (N.D. Cal. Mar. 24, 2020) ............20

*Reynolds v. Beneficial National Bank,*
    288 F.3d 277 (7th Cir. 2002) ...........................................................… 40-41

*Sakiko Fujiwara v. Sushi Yasuda Ltd.,*
    58 F. Supp. 3d 424 (S.D.N.Y. 2014)..............................................................23

*Sandwiches, Inc. v. Wendy's Int'l, Inc.,*
    822 F.2d 707 (7th Cir. 1987) .....................................................................2

*Silverman v. Motorola Sols., Inc.,*
    739 F.3d 956, 959 (7th Cir. 2013) .....................7, 14, 17, 18, 22, 27, 28-30, 32-33, 35, 42

*In re Stericycle Sec. Litig.,*
    35 F.4th 555 (7th Cir. 2022)....................................… 4, 14, 17, 18, 28-29, 41, 45

*Stobie Creek Invs., LLC v. United States,*
    81 Fed. Cl. 358 (Ct. Fed. Cl. 2008), *aff'd,* 608 F.3d 1366 (Fed. Cir. 2010)..................41

*In re Synthroid Mktg. Litig.,*
    264 F.3d 712 (7th Cir. 2001) ("*Synthroid I*")................2, 9, 14-19, 22, 24, 26, 28-30, 35

*In re Synthroid Mktg. Litig.*,
    325 F.3d 974 (7th Cir. 2003) ("*Synthroid II*") .............. 3, 7, 14, 17, 19, 26, 28-30, 35, 39

*United States v. Lowe*,
    632 F.3d 996 (7th Cir. 2011) ............................................................................4

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
    2017 WL 1352859 (N.D. Cal. Apr. 12, 2017)............................................43

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
    19 F.3d 1291 (9th Cir. 1994) ......................................................................37

*Williams v. Rohm & Haas Pension Plan*,
    658 F.3d 629 (7th Cir. 2011) ................................................................16, 24

## Rules and Statutes

15 U.S.C. § 15(a) ........................................................................................................1

15 U.S.C. § 26 ............................................................................................................1

15 U.S.C. § 78u-4(a)(3)(B)(v) ................................................................................42

28 U.S.C. § 1291 ........................................................................................................1

28 U.S.C. § 1331 ........................................................................................................1

28 U.S.C. § 1332(d)(2) ..............................................................................................1

28 U.S.C. § 1337 ........................................................................................................1

Fed. R. App. Proc. 4(a)(1)(A) ..................................................................................1

Fed. R. Civ. Proc. 23(e)(1)(B) ..................................................................................7

Fed. R. Civ. Proc. 23(h) ..................................................................................3, 14, 40

Fed. R. Civ. Proc. 54(a) ............................................................................1

Fed. R. Civ. Proc. 54(b) ............................................................................1


<u>Other Authorities</u>

BRICKMAN, LESTER,
     LAWYER BARONS (2011) ....................................................................43

Burch, Elizabeth Chamblee,
     *Monopolies in Multidistrict Litigation,*
     70 VAND. L. REV. 67 (2017)........................................................21, 42

Easterbrook, Frank,
     *Discovery as Abuse,*
     69 B.U. L. REV. 635 (1989) ............................................................34

Editorial Board,
     *The Anthem Class-Action Con,*
     WALL ST. J. (Feb. 11, 2018) ...........................................................45

Eisenberg, Theodore, & Geoffrey Miller,
     *Attorney Fees in Class Action Settlements: 1993-2008,*
     7 J. EMPIRICAL L. STUD. 248 (2010) ....................................24, 30, 39

Fitzpatrick, Brian,
     *An Empirical Study of Class Action Settlements and Their Fee Awards,*
     7 J. EMPIRICAL L. STUD. 811 (2010) ..........................................39, 43

Fitzpatrick, Brian,
     *A Fiduciary Judge's Guide to Awarding Fees in Class Actions,*
     89 FORDHAM L. REV. 1151 (2021)...................................................41

Fitzpatrick, Brian T.,

    *Do Class Action Lawyers Make Too Little?*,

    158 U. PA. L. REV. 2043 (2010) ...................................................................42

*FTC Workshop—Protecting Consumer Interests in Class Actions*,

    18 GEO. J. L. ETHICS 1243 (2005) .............................................................25

Liptak, Adam,

    *When Lawyers Cut Their Clients Out of the Deal*,

    N.Y. TIMES (Aug. 13, 2013) .......................................................................45

Logan, Stuart, *et al.*,

    *Attorney Fee Awards in Common Fund Class Actions*,

    24 CLASS ACTION REPORTS (March-April 2003) .......................................39

Ostoyich, Joseph, and William Lavery,

    *Looks Like Price-Fixing Among Class Action Plaintiffs Firms*,

    LAW360 (Feb. 12, 2014) ..............................................................................22

Perino, Michael,

    *Markets and Monitors: The Impact of Competition and Experience on Attorneys'*

    *Fees in Securities Class Actions* (2006).......................................................42

**Statutes, Regulations, and Rules**

Federal Rule of Civil Procedure 23. Class Actions.

**(g)    Class Counsel.**

(1) Appointing Class Counsel. Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

…

(C) may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

(D) may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); …

…

**(h)    Attorney's Fees and Nontaxable Costs.**

In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

(1) A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

(2) A class member, or a party from whom payment is sought, may object to the motion.

(3) The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

## Jurisdictional Statement

The district court had jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and members of the class are citizens of a State different than at least one of the defendants. Dkt. 3747 ¶¶ 15.[1] For example, named plaintiff Linda Cheslow is a citizen of California, and defendant Tyson Foods, Inc., is a Delaware corporation headquartered in Arkansas. *Id.* ¶¶ 20, 50. Plaintiffs also asserted federal-question jurisdiction for their putative federal antitrust claims under 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15(a) and 26. *Id.* ¶ 15.

The district court granted class counsel's motion for attorneys' fees from the settlement common fund in an order filed October 7, 2022. A4. (The district court previously issued final judgment under Rules 54(a) and (b) on December 20, 2021. A172. This appeal does not challenge the settlement approval.) John Andren filed a notice of appeal on October 21, 2022. A205. This appeal is timely under Fed. R. App. Proc. 4(a)(1)(A).

This Court has jurisdiction under 28 U.S.C. § 1291, which provides jurisdiction over appeals from all final decisions of district courts. The post-approval fee decision is an independently appealable collateral order. *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 200-01 (1988).

While "interim" fee orders (A1) are not typically final (*Birchmeier v. Caribbean Cruise Line, Inc.*, 896 F.3d 792, 795 (7th Cir. 2018)), the fee awards here are in fact post-judgment final awards with respect to the six settling defendants, will result in the

---

[1] "Axyz" refers to page xyz of Frank's Appendix in this appeal. "Dkt." refers to docket entries in Case No. 16-cv-8637 (N.D. Ill.) below.

allocation of distributions to the attorneys and class, and are therefore independently reviewable because they follow a final decision on the merits. *Cf. Sandwiches, Inc. v. Wendy's Int'l, Inc.*, 822 F.2d 707, 711 (7th Cir. 1987). Or even if the fee awards were truly "interim," an interim award may be final when it "lays out a formula for calculating the [future] award's amount." *Birchmeier*, 896 F.3d at 795. The district court's award does this, concluding that 33⅓% is the "market rate" for attorneys' fees, regardless of the size of the fund. A12. If this Court nevertheless determines it lacks jurisdiction, Andren asks in the alternative that it hold this case in abeyance until all pending litigation has concluded.

John Andren, a class member who filed a claim for recovery from the common fund, timely objected to the fee request, filed a claim, and appeared at the fairness hearing through counsel. A79, Dkt. 5315. Thus, Andren is a "party" entitled to appeal adverse rulings without the need to formally intervene; he has standing to appeal the fee award and related orders. *Devlin v. Scardelletti*, 536 U.S. 1 (2002); *Birchmeier*.

## Statement of the Issues

This is an appeal from an order awarding $57.4 million to class counsel, one third of a net settlement fund of $172.2 million, over appellant John Andren's objection to the fee request.

1.     The Seventh Circuit requires a "market-mimicking approach." When setting attorneys' fees in a common-fund class-action settlement, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market" that would have been negotiated at the outset of litigation. *E.g., In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718-19 (7th Cir. 2001) ("*Synthroid I*"). Bids made by plaintiffs' counsel in other litigation show "what levels of compensation attorneys are willing to accept in competition." *Id.* at 721.

Did the district court err in deciding it could not properly consider bids submitted by one of the plaintiffs' firms in other antitrust litigation, concluding instead that "the only available evidence of the 'market rate' is past awards"?

2.      A "national market" exists for complex litigation. *In re Synthroid Mktg. Litig.*, 325 F.3d 974, 976 (7th Cir. 2003) ("*Synthroid II*"). Disclosures by plaintiffs' counsel show that courts in the Ninth Circuit generally award these firms no more than 25% in complex antitrust litigation—and often significantly less. These firms continue to vie for appointment in dozens of Ninth Circuit cases. Did the district court err when—in reckoning the "market rate" from past attorneys' fee awards—it "discounted awards from the Ninth Circuit" that "awarded percentages smaller than what Appointed Counsel seek here" as below-market?

3.      This Court holds that the *ex ante* market rate for attorneys' fees "as a percentage of recovery[] likely falls as the stakes increase." *Synthroid II*, 325 F.3d at 975 (ultimately ordering a declining-rate structure to be imposed on remand). Did the district court err in concluding that Seventh Circuit law repudiates declining marginal rate fee structures?

4.      Rule 23(h) requires that objectors know the basis of the attorneys' fee motion so that they can provide a meaningful opportunity to object. *Redman v. RadioShack Corp.*, 768 F.3d 622, 637 (7th Cir. 2014). Did the district court abuse its discretion in repeatedly crediting purported expert opinions submitted by other parties for an earlier fee request for a different class settlement that class members in this settlement were given no notice of and no opportunity to test in discovery?

## Standard of Review

This Court reviews fee awards for abuse of discretion. *In re Stericycle Sec. Litig.*, 35 F.4th 555, 559 (7th Cir. 2022). A district court abuses its discretion if it "reaches an erroneous conclusion of law" or "reaches a conclusion that no evidence in the record supports as rational." *Id.* (internal quotations and citations omitted). "Abuse of discretion occurs when the district court commits a serious error of judgment, such as the failure to consider an essential factor." *United States v. Lowe*, 632 F.3d 996, 997 (7th Cir. 2011).

This Court will "review de novo whether the district court's legal analysis and method conformed to circuit law" for Rule 23(h) awards. *Stericycle*, 35 F.4th at 559.

## Statement of the Case

The district court below appointed counsel for three sets of private plaintiffs—Direct Purchasers, Commercial Indirect Purchasers, and End-Users—who allege price fixing in the market for chicken meat, called "broiler chicken."[2] Objector John Andren is a member of the End-User class. His appeal challenges a fee award of $57,400,000, which is one third of the net $172.2 million settlement common fund, to Class Counsel for the End-User class—the co-lead firms Hagens Berman Sobol Shapiro LLP and Cohen Milstein Sellers & Toll PLLC. All three sets of plaintiffs settled with some defendants, and all three continue litigation against non-settling defendants.

---

[2] The district court and parties generally refer to these plaintiffs as DPPs, CIIPPs (for "Commercial and Institutional Independent Purchaser Plaintiffs"), and EUCPs, but this brief will use short English terms instead.

A.    **A direct-purchaser antitrust suit against chicken producers inspires copycat lawsuits by Class Counsel, whom the court appoints to represent the End-User class.**

On September 2, 2016, Maplevale Farms, Inc., represented by other counsel, filed a 113-page antitrust complaint against chicken producers. Dkt. 1. Maplevale, who sought to represent a class of direct purchasers, alleged coordinated price increases that allegedly emerged around 2008-2009 from throttling production. *Id.* at 36-72.

The firm Wolf Haldenstein filed the first antitrust complaint on behalf of indirect consumer purchasers on September 13. *Drucker v. Koch Foods*, No. 16-cv-8637 (N.D. Ill.), Dkt. 1. Hagens Berman followed on September 14; it copied factual allegations of the Maplevale complaint nearly verbatim. *Percy v. Koch Foods*, No. 16-cv-8931 (N.D. Ill.), Dkt. 1. Cohen Milstein filed its first antitrust action on behalf of indirect purchasers two days later. *Gilber v. Tyson Foods*, No. 16-cv-9007 (N.D. Ill.), Dkt. 1.

Class Counsel moved for appointment as interim class counsel for indirect purchaser consumers. Dkt. 117, 218. Another group also sought appointment on behalf of all indirect purchasers. Dkt. 116. At first, the district court denied Class Counsel's applications without prejudice, instead appointing a different counsel to represent all indirect purchasers, expressing concern that a multiplicity of subclasses would increase the attorney-fee cost. "More lead counsel means higher attorneys' fees, as sure as night follows day." Dkt. 144 at 4-5.

At a status conference in December 2016, a Hagens Berman attorney appeared on its renewed motion for appointment, arguing that duplication would make no difference to the ultimate fee award. "At the end of the day, there's a certain amount of damages that defendants are going to be liable for. This Court may or may not award a fee—a percentage award fee that might be 25 percent. It's only a matter of how much they've put in versus how much we've put in. The cost to the class does not go up." Dkt. 245 at 25-26. The district court decided that the conflict between end-users and

large commercial purchasers was real (*id.* at 38), but required new filings for the appointment. Dkt. 243. Class Counsel and Wolf Haldenstein filed competing motions for appointment. Dkts. 247 & 246. The district court created two separate indirect-purchaser classes and appointed Class Counsel for the End-User Consumer Plaintiffs. Dkt. 248.

## B.   Litigation on behalf of all three classes proceeds in tandem, and the Antitrust Division intervenes.

Throughout the litigation, dozens of corporations opted out of the proposed classes and filed their own actions against defendants. By February 2021, purchasers representing about 61% of direct sales from Pilgrim's Pride Corp. and Tyson Foods, Inc.—by far the largest two chicken producers—had filed their own individual opt-out actions against the defendants. Dkt. 4387 at 10.

In June 2019, the Department of Justice's Antitrust Division moved to intervene in the actions and sought a stay of discovery to protect the grand jury's investigation, which ultimately resulted in indictments in the District of Colorado beginning in June 2020. Dkt. 2268, 3637.

On February 23, 2021, Pilgrim's Pride pleaded guilty to engaging in a conspiracy to fix broiler chicken prices. *United States v. Pilgrim's Pride Corp.*, 20-cr-0330-RM, Dkt. 58 (D. Colo.). After some mistrials and acquittals, the Department dismissed remaining criminal cases in October 2022.

## C.   Settlements with certain defendants.

Direct Plaintiffs and Commercial Indirect Plaintiffs reached several small settlements between 2017 and 2020. Direct Plaintiffs reached settlements with Pilgrim's Pride and Tyson, the two largest producers, in January 2021. Dkt. 4259. The district court preliminarily approved these settlements the same day Pilgrim's Pride pleaded guilty. Dkt. 4331.

End-User Plaintiffs reached settlements with Pilgrim's Pride, Tyson, and four smaller defendants for a total of $181 million and moved in March 2021 for preliminary approval of these settlements. Dkt. 4377, 4920.[3] The court approved class notice for all six settlements in August 2021, fixing an objection deadline of November 10, 2021. A173; Dkt. 5165.

Two weeks before the objection deadline, End-Users moved for attorneys' fees, seeking 33.0% of the gross common fund, $59.73 million. Dkt. 5160. The motion and accompanying brief (Dkt. 5161) did not proffer expert evidence.

**D.    Direct Plaintiffs' counsel move for and receive an interim fee award of 33⅓%.**

Meanwhile, in April 2021, Direct Plaintiffs made its first fee request, moving for an interim payment of attorneys' fees of 33⅓% of the fund for all settlements it had reached, net expenses. Dkt. 4551.

On August 4, 2021, the district court issued a minute order in response to the Direct Purchaser Plaintiffs' motion. "At least twice, the Seventh Circuit has suggested that district courts apply a sliding scale in awarding class counsel fees." A56 (citing *In re Synthroid Mktg. Litig.*, 325 F.3d 974, 978 (7th Cir. 2003) and *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 959 (7th Cir. 2013)). "The Court's current intent is to apply such a scale to the fee award in this case. The DPPs should file a brief addressing: (1) whether application of a sliding scale is appropriate in this case; and (2) if the Court applies a sliding scale, what that sliding scale should be. The DPP's brief on these issues should directly engage the authorities cited above, and provide any other more recent authorities on this issue (preferably in antitrust cases)." A56. The district court

---

[3] A technicality immaterial to this appeal: after the 2018 amendments to the Rules, there is no such thing as "preliminary approval," just a Rule 23(e)(1)(B) decision to direct notice. In practice, litigants and courts continue to use the obsolete term.

permitted Commercial Indirect and End-User Plaintiffs to file briefs on the matter, although neither had yet moved for an attorneys' fee award. *Id*. On September 15, 2021, Counsel for all three putative classes responded.

Counsel for Direct and Commercial Indirect Plaintiffs argued that a declining scale award would be inappropriate under Seventh Circuit law. Dkts. 5048, 5050. Each attached declarations by law professors acting as experts and endorsing fee awards of 33⅓% even for sizable common funds. A57; Dkt. 5050-1. End-User Plaintiffs argued the same without use of an expert report. Dkt. 5049-1.

No Direct Purchaser objected to the 33⅓% fee request for that settlement class. (Purchasers representing the majority of the class's purchases already opted out to pursue individual actions against defendants, leaving about 8000 smaller direct purchasers in the Direct Purchaser settlement class. Dkt. 4387 at 10.) The district court granted Direct Purchasers' fee request in full on November 30, 2021, crediting both law-professor declarations for the proposition that the Seventh Circuit disfavors fee awards that employs a declining scale for successively larger tranches of recovery. A111.

End-User consumers received no notice of these requests or proceedings, which the court initiated before it approved End-User class notice. The End-User settlement website included neither the August 4 order nor Class Counsel's September 15 filing, much less the filings from the other class counsels.[4]

## E.     John Andren objects and serves limited discovery.

On November 10, 2021, John Andren objected to the attorneys' fee request. Dkt. 5182. As an objector, Andren is a class member, having purchased raw chicken

---

[4] For an archived October 2021 snapshot of the settlement website, *see* https://web.archive.org/web/20211006044329/https://www.overchargedforchicken.com/important-documents (last accessed Dec. 18, 2022).

meat for personal consumption and made a claim. A81. Andren is also an attorney with the nonprofit Center for Class Action Fairness, which represents him. *Id*.

Andren argued the fee request exceeds the hypothetical *ex ante* market rates that the Seventh Circuit requires courts to mimic. A83. He observed that fee awards from other cases cannot be "market rates" and instead often reflect uncontested proposed orders written by plaintiffs' firms. A86. In this case, he argued, better market data exists, in the form of Hagens Berman's bids trying to secure appointment as lead counsel in two other antitrust cases. A87-A91 (citing *Synthroid I*, among other cases). Each Hagens Berman bid provides substantially lower percentage awards for settlements before class certification, and smaller percentages for larger recoveries. A88. For example, the *Optical Disk Drive* proposal used this grid:

| | Pleading through Decision on Motion to Dismiss | After Motion to Dismiss through Adjudication of Class Certification | After Adjudication of Summary Judgment | Through Trial Verdict and Appeal |
|---|---|---|---|---|
| First $5,000,000 | 0% | 0% | 0% | 0% |
| $5,000,001 - $25,000,000 | 5% | 14% | 14% | 14% |
| $25,000,001 - $50,000,000 | 4% | 13% | 13.25% | 14% |
| $50,000,001 - $75,000,000 | 3% | 12% | 13% | 14% |
| $75,000,001 - $100,000,000 | 2.5% | 11.5% | 12.5% | 13.5% |
| $100,000,001 - $200,000,000 | 2% | 10% | 11% | 12% |
| $200,000,001 - $400,000,000 | 1.5% | 7% | 8% | 9% |
| $400,000,001 and above | 1% | 5% | 6% | 7% |

A88; A101.

Class Counsel's December 6 response argued that the *Optical Disk* and *Lithium Batteries* bids Andren cited were "below market" because they were offered within Ninth Circuit district courts, which employ a 25% "benchmark" for presumptively reasonable attorneys' fees. Dkt. 5249 at 6. Class Counsel attached a declaration by name partner Steve W. Berman that said, "to win a bid in the Ninth Circuit, law firms must bid under 25%, even if this is below the market rate elsewhere." A131. Berman further asserted that "Hagens Berman has learned that they [competitive bids] are not in the best interests of the class and are not reflective of what the market will bear." *Id*. Andren served additional discovery on December 16 to test Berman's *ipse dixit* assertions about market rates, risk, and bidding. A162; A153-54.

Andren moved on December 17 to compel responses to the discovery after Class Counsel indicated that they would not provide substantive responses. A136; A146. Andren's counsel also filed a declaration and offer of proof of what the discovery would show. A144. The offer of proof said that *ex ante* fee bids would show that 33% exceeds the competitive market rate; moreover, the sum of billing in both successful and unsuccessful antitrust litigation would reveal a substantial multiplier to lodestar even in view of the risk incurred. A152-53.

Andren also noted that the Berman declaration contradicts the record in other cases, and that responses to interrogatories would prove this. A148-52. For example, Berman asserted that his firm belatedly "learned" that its 2010 *Optical Disk* bid was "below market" to "get our foot in the door," but Andren noted that the bid cited over a decade of experience, including lead counsel service in the huge *Visa* antitrust suit brought in 1996. A148-49. Moreover, Hagens Berman never argued in *Optical Disk* or *Batteries* that its bids were below market, only that courts should not consider the bids. A151-52. Berman had complained that the *Optical Disk* and *Batteries* cases had resulted

in fees below lodestar, but neglected to mention to the court that those two cases were unsuccessful, and settled for 4% to 6% of the billions of dollars of alleged treble damages. A150-51. Andren further noted that, though Berman claimed that the Ninth Circuit regularly awards fees below the "market rates" of other jurisdictions, his firm as recently as May 2021 had sought co-lead counsel status in an antitrust case there. A148. While Berman said firms "must" bid below market rate in the Ninth Circuit, Andren noted that was a *non sequitur*: nothing forced a firm to ask for a below-market rate rather than seek a market-rate elsewhere. A148. Andren also identified discrepancies between Berman's claims about the *Batteries* bid and what that litigation's record showed. A149. Finally, Andren pointed out that Berman's declaration did not identify any changes in antitrust law or in complex litigation that would make the *ex ante* bids in 2010 and 2013 inapplicable in this 2016 case. A152.

Andren also addressed the purported expert opinion the district court relied on in granting the Direct Purchaser fee award after the objection deadline, objecting to reliance on experts proffered by other counsel without the opportunity to conduct discovery. A154. The offer of proof noted that the experts "did not consider the information that complete answers to Andren's interrogatories would provide; depositions of the experts would demonstrate this, and demonstrate that their opinions in this case are not reliable because they ignore the best evidence of market rate as the Seventh Circuit defines it" and were opining on a concept of "market rate" differing from the Seventh Circuit definition. *Id*.

Class Counsel disputed none of the characterizations in the offer of proof, arguing instead about burden and timeliness. Dkt. 5316. They did not dispute that it would be unfair for the court to rely on expert witnesses Andren had no notice of or opportunity to depose. *Id*.

**F.    The district court overrules Andren's objections and awards a fee percentage greater than class counsel requested.**

At the fairness hearing on December 20, the district court granted final approval to the settlements but reserved ruling on the issues of fees and Andren's interrogatories. Dkt. 5303. While those two motions were pending, the court granted certification motions for all three classes in May 2022. Dkt. 5644.

On August 30, 3022, without a hearing, the district court ruled on Andren's discovery motion. A1. It required Class Counsel to disclose under seal (1) any bids made by counsel in an antitrust case; (2) the actual fee award in every antitrust case; and (3) the lodestar and percentage of the awards sought—but only in cases since September 2, 2016. A2-3. And it denied discovery on Class Counsel's representations about risk and earlier bids and market rates. A2. It did not mention Andren's complaints about the experts.

Class Counsel's disclosures reveal that both Hagens Berman and Cohen Milstein engage in substantial litigation in Ninth Circuit courts, notwithstanding Berman's claim that the Ninth Circuit benchmark is below market. A185-98. The vast majority of those cases awarded 25% fees and often substantially less. The disclosure also revealed another Hagens Berman bid, submitted November 20, 2015, that capped attorneys' fees at 20%. A202.

Following these disclosures, on October 7, 2022, the district court awarded Class Counsel 33⅓% of the net common fund. A4.[5] The district court did "not put much

---

[5] Class Counsel had moved for 33.0% of the gross common fund. Dkt. 5160. The district court appropriately limited the fee award to a percentage of the net common fund, but in the process increased the percentage to 33⅓%, while calling it 33%. A15 ($57.4 million = one third of $172.2 million). To simplify matters, we concede that the district court's statement that it was awarding $57.4 million controls over the mathematical error implying a $56.8 million award.

stock" in bids submitted by Hagens Berman because (1) the "most recent is more than seven years old"; (2) the Seventh Circuit supposedly found the declining percentages "do not reflect market realities and impose a perverse incentive"; and (3) citing the declaration of Prof. Klonoff, "cases within the Seventh Circuit have similarly recognized that the auction concept is flawed." A9.

The district court found that the case was risky as reflected by "few other counsel expressed interest" in representing plaintiffs. A10 (citing *Silverman*).

Having discounted the bids, the court concludes that "the only available evidence of the 'market rate' is past awards." A13. But the district court also discounted the past awards from other circuits. "These decisions are infected by default rules recommending smaller attorney fee award percentages for 'megafunds.'" A11. "Thus, to the extent that courts in other circuits have awarded percentages smaller than what Appointed Counsel seek here, the Court finds those awards and their reasoning relatively unpersuasive." A12. At the same time, the court also declined to compare those fee awards that were lesser in percentage terms but "greater in absolute amount." A13.

Andren filed a timely notice of appeal. A205.

## Summary of the Argument

The district court misconstrued Seventh Circuit law to mean nearly the opposite of what it actually stands for. This Circuit holds that attorneys' fees should resemble rates that would be negotiated *ex ante* by knowledgeable clients. But the district court confused this Court's rejection of *auctions* with Andren's request to consider *bids* as evidence of those *ex ante negotiations*, and disregarded competitive bids submitted by co-lead Class Counsel. It instead relied solely on *ex post* awards issued by other courts. Whereas this Circuit recognizes that the market for class action attorneys is national and

that fees should compensate attorneys fairly in view of other available opportunities, the district court categorically discounted fee awards by courts outside this Circuit when they awarded less than Class Counsel seeks here. And, finally, the district court confused As applied by the district court, the *ex ante* static "market rate" equals 33⅓% in every antitrust case, no matter how early the litigation settles and no matter how large the litigation or settlement.

This Circuit's market-mimicking approach to attorneys' fee awards demands reversal of the fee award. As this Court knows, sophisticated private parties negotiate fees that provide declining percentages for successively larger brackets of recovery. *E.g.*, *Stericycle*, 35 F.4th at 562; *Silverman*, 739 F.3d at 959; *Synthroid II*, 325 F.3d at 975; *Synthroid I*, 264 F.3d at 718. Private parties also negotiate fees that increase in later stages of the litigation, which serves a dual purpose in compensating attorneys for bearing the risk of case-dispositive motions, and for awarding attorneys larger fees for their investment. *Synthroid I* considered the costs and benefits of declining scales in various scenarios (264 F.3d at 721), and then *Synthroid II* ordered the application of a declining scale. 325 F.3d at 980. But the district court mistakenly construed *Synthroid I*'s acknowledgement of a possible disadvantage of a declining scale as a holding forbidding declining scales. A9. This is an error of law requiring reversal.

Similarly, the district court erred in its understanding of the meaning of this Circuit's criticism of auctions. Yes, *Silverman* rejects auctions; but Andren did not ask for an auction. Andren asked the district court to follow *Synthroid I*, and consider "bids … seeking the right to represent a class" as evidence of the market rate. 264 F.3d at 719. A "court can examine the bids and the results to see what levels of compensation attorneys are willing to accept in competition." *Id.* at 721. The district court erred in refusing to do so. Hagens Berman's bids suggest that fees no higher than 20% generally provide adequate incentive to litigate against cartels, and that in any event the highest

rates ought to be reserved for modest recoveries less than $75 million secured after trial—not $181 million common funds secured before class certification. The early stage and large size of the fund warrant a smaller percentage award than the theoretical top rate that would be bargained *ex ante*.

Additionally, the district court's reliance on purported expert opinions by two law professors provides an independent reason to vacate its fee award. Rule 23(h) requires objectors to have fair notice of the basis of a fee award. *Redman*, 768 F.3d at 637. Objector Andren had no opportunity to investigate the claims of these experts, which were not submitted by Class Counsel, but by Direct Purchaser and Commercial Indirect Plaintiffs in support of their unopposed fee requests on behalf of different classes without notice to Andren. Andren submitted an offer of proof that discovery would demonstrate the purported expert opinions ignored evidence that competitive market rates do not resemble the 33⅓% fees courts often rubber-stamp without objection. But the district court ignored Andren's critiques and requests, and instead improperly relied on expert opinions about the law.

## Argument

## I.     The district court misapplied Seventh Circuit law.

The district court turned Circuit precedent on its head by refusing to consider the best evidence of *ex ante* market rates: actual bids co-lead Class Counsel submitted to secure appointment as interim class counsel in other complex antitrust cases. The lower court erred as a matter of law in concluding "in large cases like this, the only available evidence of the 'market rate' is past awards." A13. The district court compounded its error by categorically "discount[ing]" fee awards from "courts in other circuits [that] have awarded percentages smaller than what Appointed Counsel seek here." A12, A13.

Under the lower court's premises—that only *ex post* fee awards provide evidence of *ex ante* market rates and that smaller *ex post* fee awards may be discarded—"*ex ante* market rates" boil down to awarding 33⅓% in every case, at least every antitrust case. These premises vitiate Circuit law in three distinct ways.

*First*, bids by co-lead Class Counsel not only constitute evidence of market rates, they are the best evidence of market rates in the record. This Court requires district courts to "assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys." *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011). A bid represents at least one side of that bargain: an offer. A "court can examine the bids and the results to see what levels of compensation attorneys are willing to accept in competition." *Synthroid I*, 264 F.3d at 721. The rates that co-lead Class Counsel bid *ex ante* in other antitrust litigation could not be below-market poverty wages from the perspective of counsel, because they voluntarily bound themselves to these rates. The district court dismissed the bids as being too old and supposedly contrary to Seventh Circuit law. But there was no evidence in the record for the first proposition. Moreover, the *ex ante* approach requires courts to examine the bargain that would be struck from the outset of the litigation—that is, the *ex ante* market rate from 2016, six years ago. A bid undertaken seven years ago should be highly probative!

(That Hagens Berman ceased making bids shows no more than that they found it more lucrative to ask for *ex post* fee awards—as happened here.)

*Second*, the second proposition, that declining-rate bids are contrary to Seventh Circuit law, is simply erroneous. "Both negotiations and auctions often produce diminishing marginal fees when the recovery will not necessarily increase in proportion to the number of hours devoted to the case." *Synthroid I*, 264 F.3d at 721. This Court has repeatedly endorsed fee awards that vary depending on the stage of litigation and with percentages that decline for successively larger brackets of recovery, precisely because

savvy plaintiffs insist on such terms. *See, e.g., Stericycle*, 35 F.4th at 562; *Synthroid II*, 325 F.3d at 975; *Synthroid I*, 264 F.3d at 718-21. *Synthroid II* expressly commanded such a structure. 325 F.3d at 980.

 *Finally*, even if the court must rely on other courts' fee awards to ferret out an *ex ante* market rate, it should not arbitrarily exclude courts that regularly award lower fees than the most generous district courts, nor should it gerrymander its sample to exclude cases that award a lower percentage but a greater absolute fee. Antitrust plaintiffs operate in a nationwide market, and Ninth Circuit courts are among the most experienced in presiding over these cases. Plaintiffs' firms, including Class Counsel, regularly vie for appointment in Ninth Circuit courts, which contradicts Class Counsel's self-serving testimony that 25% (or smaller) fee awards are "below market." Approximating *ex ante* market rates *ex post* requires an examination of attractive opportunities available to antitrust counsel, including those outside the Seventh Circuit.

**A.** **Offers of actual competitive bids constitute the best available evidence of the hypothetical *ex ante* bargain between the class and their attorneys.**

 This Court has "held repeatedly that, when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Synthroid I*, 264 F.3d at 718. "When a fee is set by a court rather than by contract, the object is to set it at a level that will approximate what the market would set. … The judge, in other words, is trying to mimic the market in legal services." *Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998) (cleaned up). Because class members and nominal named plaintiffs have no ability or experience in negotiating attorneys' fees judges "must step in and play surrogate client." *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992).

Because no *ex ante* market exists, the Seventh Circuit has suggested several "benchmarks" to help district courts estimate the market fee: (1) actual fee contracts between (sophisticated) plaintiffs and their attorneys; (2) data from similar common fund cases when fees were privately negotiated; and (3) information from class-counsel auctions. *Synthroid I*, 264 F.3d at 719-20. While the retention agreements of the unsophisticated consumer plaintiffs in this case included no limitations of fees, the other two benchmarks were available, but the district court pooh-poohed them. Courts have no discretion to conduct an "incomplete" analysis. *Stericycle*, 35 F.4th at 560.

The district court ignored this Circuit's command to employ market-approximating rates and instead found that "the only available evidence of 'market rate' is past awards." A13. Based only on the awards in Seventh Circuit districts, the district court imagined that the market rate or *ex ante* fee agreement consists of one term: a percentage, which happens to be 30-33% for all antitrust cases irrespective of size or stage of litigation. This does not capture the real or idealized market for legal services. At least two other important variables exist, as this Court has said.

*First*, a surrogate client would agree to fees that would marginally decline as the size of the fund increases. As a matter of rational economic incentives, this phenomenon occurs because it does not take ten times as much work to resolve a $45 million litigation as a $4.5 million suit—economies of scale are possible for claims that are more intrinsically valuable to the client. *Silverman*, 739 F.3d at 959.

*Second*, the market has shown that "[s]ystems where fees rise based on the stage of litigation rather than the calendar are more common in private agreements." *Synthroid I*, 264 F.3d at 722. That is, fees in private fee agreements increase as the case passes key milestones and the risk to attorneys increases.

The reason percentages increase for later stages of litigation is two-fold. First, the further a case proceeds, the more hours it takes to prosecute, and rational attorneys and

understanding clients will bargain to allow for that expense. Second, as the case clears each hurdle of litigation—motion to dismiss, summary judgment, certification, and trial—plaintiffs and their counsel bear more risk of complete failure. By settling *before* resolution of the certification motion, plaintiffs' counsel reduce the chance they walk away with nothing. If plaintiffs clear these hurdles, the reward to counsel *must* be higher because in the counterfactual where the case had been dismissed, they would have earned nothing. For this reason, sophisticated private agreements consider both the percentage of the fund and the stage of proceeding. As an "earlier settlement" of above-average size, this case likely warrants lower fees than in *Synthroid II*, where the late-stage risk was "significant." 325 F.3d at 978.

One of the co-lead Class Counsel firms submitted bids for attorneys' fees showing exactly this structure, but the district court discounted them and other competitive pricing data. The district court instead placed singular importance on *ex post* fee awards, but only awards that exceed 30% (and awards no larger in absolute terms), which assumes the conclusion and provides the least information about competitive *ex ante* market rates.

### 1. Hagens Berman's *ex ante* proposals employed declining percentages for large recoveries and early settlement.

Class Counsel's own bids in prior litigation approximate *Synthroid I*'s "benchmark" of privately negotiated fees because they demonstrate attorneys' willingness to work for a specific rate. Hagens Berman, one of the two primary lead counsel firms for the End-User class, has submitted fee structure bids as part of a motion seeking appointment as lead counsel. These bids are usually sealed, but twice, a Ninth Circuit decision required Hagens Berman to disclose the bid, and Andren flagged these bids to the district court below. Class Counsel disclosed a third case in response to

the district court's discovery order. In all three cases, Hagens committed to receive no more than 20% of any portion of class recovery, and often much less.

In 2015, eleven months before the first Broiler Chicken complaint, Hagens Berman agreed to limit its fees in the *Resistors* antitrust matter to 20% of recovery although the amount would "depend on the timing, amount, and nature of any settlement or judgment." A202. The firm later requested and received a 20% fee award of $10.05 million, which represented a 1.21 multiplier of its lodestar. *In re Resistors Antitrust Litig.*, No. 3:15-cv-03820, 2020 U.S. Dist. LEXIS 86492 (N.D. Cal. Mar. 24, 2020).

In 2010, Hagens Berman proposed for *Optical Disk Drive Products* proposed a declining scale that awarded lower percentages for earlier stages of litigation and larger recoveries, with the largest fee bracket assigned to post-trial recoveries below $75 million topping out at 14%. A101. The fee award in *Optical Disk* has been the subject of significant litigation, and the Ninth Circuit determined that "when class counsel secures appointment as interim lead counsel by proposing a fee structure in a competitive bidding process, that bid becomes the starting point for determining a reasonable fee." *In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922, 934 (9th Cir. 2020). The fee award, reduced on remand, was recently vacated and remanded a second time because it did not hew closely enough to the rates Hagens Berman committed to, which should result in a fee award less than 14%. *In re Optical Disk Drive Prods. Antitrust Litig.*, No. 21-16291, 2022 U.S. App. LEXIS 15571, at *9 (9th Cir. Jun. 6, 2022) (unpublished).

In 2013 for *Lithium Battery*, Hagens Berman proposed a similar declining scale topping out at 17%. A108. Plaintiffs were eventually awarded 30% of the fund, or $41.79 million, having incurred a significant lodestar dwarfing the fee award for a 0.58 fractional multiplier. The Ninth Circuit recently affirmed this award, because the district court did not select the Hagens Berman bid for appointment as sole interim

counsel. *In re Lithium Ion Batteries Antitrust Litig.*, Nos. 21-15120, 21-15200, 2022 U.S. App. LEXIS 31616, at \*6 (9th Cir. Nov. 16, 2022).

In fact, Hagens Berman withdrew its offer because it agreed to co-lead with a rival group of plaintiffs' counsel for appointment. *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420, Dkt. 148 at 78-79 (N.D. Cal. Apr. 16, 2013); A149-50; Dkt. 5294-9. These same attorneys, on Mr. Berman's telling, had previously "joined together to propose a leadership structure that excluded us," even though "Hagens Berman developed and filed the case." A131. From this episode, the firm supposedly learned that competitive bids "are not reflective of what the market will bear." *Id*. But the "market" does not award attorneys' fees at the end of litigation. Courts do. And courts regrettably often approve lead counsel based on popularity contests won by firms that logroll and spread supracompetitive rates among friends. That unfortunate collusion doesn't change the fact that, as a matter of economics or this Circuit's fee jurisprudence, what a market "will bear" is defined by the outcome of competition.

The district court asserted that these bids were too old, but there was no evidence for the proposition that antitrust litigation has materially changed between 2010-15, when Hagens Berman submitted these bids; and 2016, when Class Counsel filed the complaints in this case and sought to become lead counsel.

Courts' failure to investigate *ex ante* fee terms harms class members. Just as collusion can saddle consumers with harmfully supracompetitive prices for chicken, collusion eliminates beneficial competition for absent class members' interests. "[J]udges should reject consensus slates for leadership positions and use a competitive selection process where attorneys openly jockey to hold the leadership's monopoly power. Competing *for* the market, that is, competing to *become* the monopoly, may produce some of the same benefits of open market competition." Elizabeth Chamblee Burch, *Monopolies in Multidistrict Litigation*, 70 Vand. L. Rev. 67, 77-78 (2017); *Fresno*

*County Employees' Ret. Ass'n v. Isaacson/Weaver Family Trust*, 925 F.3d 63, 71-72 (2d Cir. 2019) (endorsing *ex ante* bidding as a way for courts to discharge their fiduciary obligations to control costs); *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 201 n.6 (3d Cir. 2000) (competitive bidding "appears to have worked well, and we commend it to district judges").[6] *Silverman* discourages auctions *qua* auctions, but does commend (though not require) *ex ante* fee-setting. 739 F.3d at 957-58. It does not contradict *Silverman* to hold that a firm's *actual* bids in similar litigation are evidence of a market rate, as *Synthroid I* held, and that the district court committed reversible error by disregarding them.

### 2.   *Ex post* fee awards provide vastly inferior evidence of the hypothetical *ex ante* market rate.

Although the district court goes to extraordinary lengths to discount market evidence, it entirely elided Andren's observation that *ex post* fee awards systematically *overstate* true market rates. A86-87.

The most significant problem is that courts rarely resolve fee awards in an adversarial setting. No objector appeared to contest the fee request in either of the other

---

[6] Hagens Berman's own litigation history shows the value of soliciting proposals from skilled counsel. According to Berman's own retelling, "Hagens Berman pioneered" *Batteries*, but "other firms joined together to propose a leadership structure that excluded it." A131. (Berman's contemporaneous 2013 declaration about this effort is even more Grishamesque. A149-50; A105-07.) Firms often collude on leadership, as Hagens Berman eventually did in *Batteries*, to present unopposed fronts without the risk of competition. (The *Batteries* court ultimately rewarded this collusion by awarding fees twice as high as those the competitive bid proposed. *Lithium Batteries*, 2022 U.S. App. LEXIS 31616. Ironic in a Sherman Act case. *Cf.* Joseph Ostoyich and William Lavery, *Looks Like Price-Fixing Among Class Action Plaintiffs Firms*, Law360 (Feb. 12, 2014).) When firms can compete on performance and not just popularity, the class benefits.

settlement classes in this litigation. Businesses and consumers with modest potential damages simply have no incentive to challenge those fee requests, because their "gain from a reduction, even a large reduction, in the fees awarded the lawyers would be minuscule." *Continental Ill.*, 962 F.2d at 573. Nor do defendants who have already agreed to the all-inclusive common fund. *Id.*

Meanwhile, the corporations with large potential damages did something more profitable by voting with their feet to get entirely out of the class actions. Direct purchasers responsible for over half the chicken sold by defendants opted out and filed over 80 direct lawsuits against the defendants. Why should Kroger invest in objecting to fees, and possibly have its objection overruled as Andren's was, when it can economically sue defendants itself? Consumers, with small stakes, don't have the ability to oversee litigation as Direct Purchaser opt-outs like Kroger and Jewel have. Because no general counsel watches out for ordinary consumers, district courts must act as their fiduciary. Such concerns are heightened when, as here, "the class members are consumers, who ordinarily lack both the monetary stake and the sophistication in legal and commercial matters that would motivate and enable them to monitor the efforts of class counsel on their behalf." *Creative Montessori Learning Ctrs. v. Ashford Gear LLC,* 662 F.3d 913, 917 (7th Cir. 2011).

*Ex post* awards overshoot the market because courts typically grant them without adversarial presentation. "By submitting proposed orders masquerading as judicial opinions, and then citing to them in fee applications, the class action bar is in fact creating its own caselaw on the fees it is entitled to... No wonder that "caselaw" is so generous to Class attorneys." *Sakiko Fujiwara v. Sushi Yasuda Ltd.*, 58 F. Supp. 3d 424, 436 (S.D.N.Y. 2014). The major force that exerts downward pressure *ex ante*—the threat of losing the representation to another firm—dissipates before settlement.

Empirical evidence bears this out. "[S]electing competent counsel using a competitive process generates a lower percentage-of-the-fund fee arrangement than Eisenberg and Miller's mean and median percentages, which mostly reflect awards granted *ex post*." *In re Capital One TCPA Litig.*, 80 F. Supp. 3d 781, 803 (N.D. Ill. 2015) (*citing* Theodore Eisenberg & Geoffrey Miller, *Attorney Fees in Class Action Settlements: 1993-2008*, 7 J. EMPIRICAL L. STUD. 248, 250 (2010)); *see also In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 947 n.7 (N.D. Ill. 2001). "Empirical evidence suggests that ex ante fee negotiation is a key mechanism for reducing agency costs between counsel and the class they represent." *Laffitte v. Robert Half Internat. Inc.*, 376 P.3d 672, 690 (Cal. 2016) (Liu, J., concurring). By contrast, *ex post* fee evaluation is "likely to be distorted by hindsight bias." *Id*.

In relying exclusively on past fee awards, the district court simply entrenches hindsight bias, and further disconnects attorneys' fee awards from the sort of *ex ante* arrangements that would benefit class members.

### 3. Class counsel's own past fee bids and requests show that a 33⅓% award substantially over-compensates lawyers at the expense of the class.

The fee structure bids Hagens Berman submitted in similar antitrust cases *ex ante* provide the best evidence of how class counsel values such litigation on an *ex ante* basis. Competitive bids are key benchmark for gauging market rate because they show what an attorney would be willing to accept as compensation. *Synthroid I*, 264 F.3d at 720; *see also Optical Disk Drive*, 959 F.3d at 934-35 (competitive bid is starting point to determine reasonable fee). Using actual bids submitted by class counsel in other similar antitrust cases is a more reliable way to "mimic [the] bargain between the class and its attorneys." *Williams*, 658 F.3d at 635.

Putative lead counsel assess their risk and price their services accordingly based on their time investment in similar class actions and their broader litigation experience.

*See, e.g.*, *In re Amino Acid Lysine Antitrust Litig.*, 918 F. Supp. 1190, 1196 (N.D. Ill. 1996). For example, if an attorney believes *ex ante* she has a very low chance of success, then she would propose a larger percentage of the recovery or a guaranteed minimum payment, as she would in the marketplace, to compensate her for that risk. *See Comdisco*, 150 F. Supp. 2d at 948 n.9 ("any sensible lawyer will have pegged his or her proposal high enough to take into account the possibility of ending up with no recovery"). "If you're going to award lawyers for the risk that they undertake in litigation, the best time to measure that risk, and in fact the only time that you can do so effectively, is at the outset of the case." *FTC Workshop—Protecting Consumer Interests in Class Actions,* 18 GEO. J. L. ETHICS 1243, 1261 (2005).

Hagens Berman's bids, past auctions, and private fee agreements all confirm that an unvaried 33⅓% fee dwarfs the market rate. None of the three bids approached 33⅓%, and the two with detailed scales reserved the highest rates for circumstances that do not apply here: modest recoveries obtained after a trial on the merits. A101; A108. Additionally, the bids for *Lithium Batteries* and *Resistors* likely *overestimate* true market rates because Hagens Berman submitted those bids without facing concrete competing bids. Ordinarily, in a competitive market—where a judge solicits competing bids—a firm proposing a rate that would result in an above-market return would find itself underbid by competitors willing to accept a smaller above-market return, until competition bid away all above-market rents. Hagens Berman faced no price competition except in *Optical Disk Drive Products*, where the district court had ordered the submission of leadership proposals including fee terms. *In re Optical Disk Drive Prods. Antitrust Litig.*, No. 10-md-2143, 2010 U.S. Dist. LEXIS 146768, at *27 (N.D. Cal. June 4, 2010). The fee scale in *Optical Disk Drive Products* is perhaps not coincidentally the thriftiest of the three, topping out at only 14%, less than half of the 33⅓% the district court found to be the global market rate. In the other two cases Hagens Berman

submitted bids unsolicited, and opposing firms refused to make a counteroffer, so Hagens could be certain *any* bid would likely be the lowest. In fact, a rival plaintiffs' firm argued that Hagens Berman inappropriately submitted its *Resistors* fee proposal *ex parte*, which supposedly would require the court to disregard it. No. 3:15-cv-03820, Dkt. 74 at 2-3 (Dec. 4, 2015).

The bids show a declining percentage of the fund tends to be awarded for successively larger recoveries, just as this Court observed. "A court must give counsel the market rate for legal services" and the "market rate, as a percentage of recovery, likely falls as the stakes increase." *Synthroid II*, 325 F.3d at 975. Market-based fees would also employ a contingency-fee percentage that compensates them for that expected risk and opportunity cost, just as Hagens Berman's bids outlined.

No better evidence of *ex ante* market rates exists in this case than the offers of co-lead Class Counsel in similar cases.

**B.     Hagens Berman's bids should not have been disregarded by the district court.**

None of the district court's reasons for disregarding the bids withstand scrutiny.

First, the district court inverts Circuit law in finding that this Court "has explained that declining scale awards do not reflect market realities." A9. The district court follows the lead of purported expert testimony it should have never considered (see Section II) and quotes *Synthroid I* for the imaginary holding that declining scales "do not reflect market realities." *Id*. (*compare* Klonoff Decl., Dkt. 5050-1 at 19). In fact, this Court simply explained the tradeoffs for the declining scale, which are "inherent in any percentage-of-recovery system, just as the lodestar approach creates the opposite incentive to run up the billable hours." 264 F.3d at 721. Far from rejecting declining fees scales, *Synthroid I* suggests that the district court investigate such a fee award, and *Synthroid II* orders one outright. 325 F.3d at 980.

Next, the district court confuses the appropriateness of holding auctions with the appropriateness of considering past bids in other cases. It parenthetically quotes *Silverman* that "solvent litigants do not select their own lawyers by holding auctions, because auctions do not work well unless a standard unit of quality can be defined and its delivery verified." A9 (quoting 739 F.3d at 957). The district court quotes a non-party expert declaration that the "auction concept is flawed." A9. But this is irrelevant to the question at hand: whether bids constitute *evidence* of *ex ante* market rates. *Silverman* rejected the notion that "auctions" should be conducted in every case, observing that knowledgeable clients don't use them because attorney quality varies. 739 F.3d at 957. But Hagens Berman's proposals come from an accomplished antitrust litigation firm. They resemble exactly the retention agreements by knowledgeable clients this Court hopes to replicate, where "*ex ante* fee structures are common and beneficial to clients." *Id*. Hagens Berman proposed such fee structures at least three times, and these suggest contours for reasonable market rates in similar cases. In none of these cases did the court conduct an "auction," and in two of them no other firm even proposed a counteroffer. In *Optical Disk*, the district court did not conduct a simple-minded "auction," but examined the capabilities, plans, and proposals of firms vying for appointment and selected Hagens Berman after a thorough evaluation. 2010 U.S. Dist. LEXIS 146768, at *28. Hagens Berman's offers do not resemble shoddy, dubious lowball bids that might win in a simple-minded "auction"—they are commitments made by one of the country's most skilled antitrust litigation firms, and the very same firm awarded fees in this case.

Next, the district court suggests the bids should not be entertained at all because this Circuit allegedly does not permit declining scale fee structures! The district court says, "when confronted with a court ordered competitive auction that permits declining scale bids, some attorneys will likely make such a bid in order to win the auction." A9.

(To the contrary, Hagens Berman made two of the three bids unsolicited, so was guaranteed to have the low bid, but intentionally sought to bind itself to a declining fee scale in *Lithium Batteries*.) The district court "questions whether it is appropriate to permit declining scale bids in an auction." *Id*. It says this is "for the reasons expressed by the Seventh Circuit," but this Court has never found declining scale bids impermissible. In a few short sentences, the district court misunderstands Circuit law to forbid fee agreements like those that knowledgeable plaintiffs actually negotiate, finding such bids "carry little weight," *id*., and later remarking "the only available evidence of the 'market rate' is past awards." A13.

The district court rejects competitive market data in favor of mimeographing percentage awards issued *ex post* by other courts in typically uncontested proceedings. The district court interprets Circuit law almost photonegative incorrectly and this Court must reverse it.

1. ***Synthroid I* did not reject declining percentages for large tiers of recovery—a structure that class counsel themselves have competitively bid in other cases—and instead promulgated such a scale as a template, going on to mandate that structure in *Synthroid II*.**

Under Circuit law, diminishing marginal rates should apply to a $181 million fund to more accurately reflect the market because "negotiated fee agreements regularly provide for a recovery that increases at a decreasing rate." *Silverman*, 739 F.3d at 959; *see also Synthroid II,* 325 F.3d at 975 (the "market rate, as a percentage of recovery, likely falls as the stakes increase"); *Synthroid I*, 264 F.3d at 721 ("Both negotiations and auctions often produce diminishing marginal fees when the recovery will not necessarily increase in proportion to the number of hours devoted to the case.").

This is because recovery depends on both the work necessary to secure a settlement *and* the strength of the litigation. *Stericycle*, 35 F.4th at 565-66. Settlements achieved early in litigation—before the motion for class certification is resolved, for

example, require less risk of nonpayment and therefore require less of an *ex ante* multiplier to compensate attorneys for bearing that risk. *Id.* at 566. Meanwhile, large settlements may reflect the strength of the claims more than the effort needed to secure settlement. *Id.*at 561-62. "The market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case." *Synthroid I*, 264 F.3d at 721. Therefore, from an *ex ante* perspective, both client and attorney would agree that early-stage settlements deserve smaller percentage fee awards, as do increasingly large settlements:

> Awarding counsel a decreasing percentage of the higher tiers of recovery enables them to recover the principal costs of litigation from the first bands of the award, while allowing the clients to reap more of the benefit at the margin (yet still preserving some incentive for lawyers to strive for these higher awards).

*Silverman*, 739 F.3d at 959 (observing that is similarly expensive to litigate a $100 million case as a $200 million case because "costs of litigation do not depend on the outcome").

For example, in *Synthroid II*, the Seventh Circuit ordered fees for consumer class counsel of 30% of the first $10 million, 25% of the next $10 million, 22% of the band from $20 to $46 million, and 15% of everything else on a fund totaling $88 million. 325 F.3d at 980. *Synthroid II* was a fraud suit against a drug manufacturer that included two classes: a consumer class and a third-party payor class. *Id.* at 976. The court recognized that the consumer class counsel in that case had assumed as great a risk as counsel for the third-party payor class in those proceedings and thus awarded fees that applied the same marginal rate awarded to the third-party payor class counsel. *Id.* at 980. The Seventh Circuit recognized that class counsel had assumed "a significant risk, for the consumer class did not have an easy road." *Id.* at 978. Class Counsel presented no evidence that

this case involves greater risk than *Synthroid II*. And, "[a]s Eisenberg and Miller concluded in 2004 and again in 2010, 'the overwhelmingly important determinant of the fee is simply the size of the recovery obtained by the class,' not the subject matter of the litigation." *Capital One TCPA*, 80 F. Supp. 3d at 803 (quoting 7 J. EMPIRICAL L. STUD. at 250). Class Counsel presented little reason to accept their view that some hypothetical class members might negotiate a flat 33% for a case such as this, while discarding legal precedent, sound analytical reasoning, and empirical data showing otherwise.

*Silverman* endorsed a flat rate rather than impose a declining rate, but that was because the appellant "did not raise this subject in the district court." 739 F.3d at 959 (expressing "concern" with the flat-rate structure, and noting that "27.5% substantially exceeds the norm for large settlements").

Nothing in *Synthroid I* & *II* proscribes their application to antitrust cases. Andren doesn't demand mechanically applying the 30/25/22/15 percentages from *Synthroid II* to this case, but those percentages applied to a $172.2 million net common fund would result in a fee of $30.15 million. A94. If that sounds like a dramatic haircut, Class Counsel's declining-rate bids in other antitrust cases suggest even larger haircuts. *E.g.*, A90.

**2.    The district court errs in dismissing bids not much older than this litigation.**

Besides misapprehending Circuit law, the district court henpecks the bid evidence because "the most recent is more than seven years old." A13. *First*, this critique makes no sense because district courts must determine *ex ante* rates, and this litigation began six years ago. Neither the district court nor Class Counsel identify changes in the market for antitrust litigation within the last twelve years—and certainly no paradigm shifting event occurred between seven years ago and less than eleven months later, when this litigation began. Hagens Berman's bids were percentage-based,

not an hourly rate made stale by inflation. (Any inflationary effect on a percentage-based fee would be offset by the inflationary effect on damages and settlement amounts; the bands of tiers might be different, but there is no reason percentages would change if the underlying risks don't change.)

Class Counsel's attempts to paint the bids as outdated similarly fail. Steve Berman declared that his firm belatedly "learned" that its 2010 *Optical Disk* bid was "below market" to "get our foot in the door." A131. But as Andren pointed out, that bid cited over a decade of experience, including appointment as lead counsel in the huge *Visa* antitrust suit brought in 1996. A149. In any event, the self-serving declaration lacks credibility on this issue. Though the *Optical Disk* and *Lithium Batteries* fees were the subject of extensive litigation, including several Ninth Circuit appeals, Hagens Berman has not previously argued their bids were below market rates, only that the bids should not be binding or considered. A151.

Neither the district court nor Class Counsel identify any changes in antitrust law or complex litigation that would have altered the *ex ante* market rates between 2010 and today—let alone between the late-2015 *Resistors* proposal the 2016 *Broiler Chicken* complaints. A152. Those bids were not just probative evidence, but the best evidence of an *ex ante* competitive market rate.

### 3.    The bids concerned litigation similar enough to provide insight that an undifferentiated 33⅓% fee award exceeds market rates.

The district court expressly refuses to give "weight" to Hagens Berman's bids because of the errors of law discussed above. A9. Had the district court instead disregarded the bids because it found *Broiler Chicken* riskier and more labor-intensive than *Resisters*, *Optical Disk*, and *Lithium Batteries*, it still inappropriately failed to apply the central premise of all three *ex ante* proposals. Namely, that the highest rate for litigation should be reserved for recoveries achieved after trial in cases without the

same economies of scale. The district court's failure to consider the stage of litigation in setting its fee award palpably departs from *ex ante* practice. Even the *Resistors* proposal, which does not outline a detailed scale, says that the fee request may be smaller than 20% "depend on the timing, amount, and nature of any settlement or judgment." A202. In other words, even if this case were riskier than the others, a 33⅓% award for a megafund achieved prior to class certification provides no room for larger ethical awards that might be required for longer litigation as a matter of economic incentives. "Our concern is less with the absolute level of fees than with the structure of the award." *See Silverman*, 739 F.3d at 959 (explaining problematic incentives created by awarding a flat percentage irrespective of stage of litigation or size of the fund).

The reason that fee scales *make sense*—the reasons that attorneys freely bid them and that clients actually bargain for them—is they help align the incentives of class and counsel. Counsel *should* have an incentive to bear the risk on a potentially dispositive motion that would greatly enhance class recovery if successful. The failure to incorporate **any** *ex ante* consideration of the stage of litigation means that the district court's order could not possibly be affirmed on an alternative ground that the prior bids concerned different cases with different strengths and weaknesses—especially when the parties presented no such evidence that the differences were so dramatic.

That said, Hagens Berman's bids arose in cases resemble the current litigation, so they should inform the Court on market *rates* as well as the structure of a hypothetical *ex ante* fee agreement in this case.

Attorneys clamored for appointment in all these cases, revealing their own beliefs about the value of each litigation. The district court oddly suggests the opposite. It quotes *Silverman* concerning the risk borne by counsel when "no other firm was willing to serve as lead counsel" and applies it here, because "few" counsel "expressed interest." A10 (citing 739 F.3d at 958). But that misunderstands *Silverman*. If a law firm

stands alone in pursuing an action, *Silverman* holds that that particular fact suggests unusual risk. When multiple firms file separate but nearly verbatim complaints within days of the first action brought by the Direct Purchasers' attorneys, that looks more like a feeding frenzy for a lucrative assignment. Both Class Counsel firms have handled vast antitrust cases alone, and both firms found it attractive to cooperate in appointment in this case. Had only one of these firms filed a complaint, that would have been enough. And other firms *did* seek appointment as class counsel—first the group of firms that became the Commercial Indirect Plaintiffs' counsel (Dkt. 116), and then Wolf Haldenstein (Dkt. 246).[7] Andren does not suggest that any complex litigation comes without risk, but numerous attorneys did not chicken out from taking this case. Firms instead vied for appointment, so this litigation could not be unusually risky.

The district court found that "plaintiffs have been opposed by many defendants, including a number of very large and well-funded corporations" (A10), but this also applies to every Hagens Berman bid it disregards. And unlike *Resistors*, *Lithium Batteries*, and *Optical Disk Drive*, *Broiler Chicken* defendants produce and sell in America. This eliminates uncertainty about the availability of robust American-style discovery, obtaining the special deposition visas that bilateral consular conventions sometimes require, the burden of translation, and whether plaintiffs can hale into court foreign defendants with small or nonexistent American footprints.

---

[7] Indeed, Wolf Haldenstein submitted a declaration in support of the Class Counsel's fee motion for 454.7 hours of work, including time billed from "from October 14, 2016 to December 14, 2016" while it was contesting appointment of Class Counsel. Dkt. 5161-6 at 2. If this includes time unsuccessfully vying for appointment, it is not compensable class-beneficial time. *Cf. Belleville Catering Co. v. Champaign Mkt. Place, LLC*, 350 F.3d 691, 694 (7th Cir. 2003).

The district court remarked that "[d]iscovery proceeded while the motions to dismiss were brief and decided, so Appointed Counsel was immediately incurring costs of time and money without any assurance of a fee award" (A10), but that procedural posture cuts against finding case risk. The district court "neither stayed discovery completely nor allowed full discovery to proceed," but prioritized certain categories of discovery *at plaintiffs' urging*. *In re Broiler Chicken Antitrust Litig.*, 2017 WL 4417447, 2017 U.S. Dist. LEXIS 160411, at *33 (N.D. Ill. Sep. 28, 2017). Class Counsel *opposed* defendants' arguments to stay discovery because they calculated discovery would favor plaintiffs. Discovery stays benefit defendants by alleviating litigation costs that might otherwise increase settlement's attractiveness. *Cf.* Frank Easterbrook, *Discovery as Abuse*, 69 B.U. L. REV. 635 (1989). While discovery costs advanced by Class Counsel are not guaranteed to be recouped, the behavior of plaintiffs demonstrates that the attorneys early in the litigation believed the discovery would return dividends that justified the investment. In other words, early discovery proves that Class Counsel believed the litigation not significantly more risky than other cases.

While plaintiffs did not initiate litigation on news of a government investigation as often occurs, the behavior of many firms in seeking appointment demonstrates that they did not find the inability to piggyback on the government (as opposed to the initiating suit of direct purchasers) to be a deal-breaker.

A final factor arguably makes the *ex ante* risk of litigation lower in this case: at the time of Class Counsel's appointment, the court had already appointed another slate of interim class counsel. Typically, antitrust cases proceed with only two sets of counsel, but here the court appointed three with representatives from eight different law firms. This broad coalition not only demonstrated that many lawyers found the litigation no more risky than typical—they could also share costs, reducing each firm's exposure to risk.

If Class Counsel contends that the bids cannot be considered because they come from different cases, this contradicts Circuit law. This Court has repeatedly considered fee arrangements from different cases. *Synthroid I,* 264 F.3d at 718; *Synthroid II,* 325 F.3d at 975; *Silverman,* 739 F.3d at 959 ("articles we have cited reinforce the observation in the *Synthroid* opinions that negotiated fee agreements regularly provide for a recovery that increases at a decreasing rate"). Whether the appropriate top-level fee should be 14% or 20% can be sorted out based on the facts as a knowledgeable plaintiff would negotiate *ex ante*. But these *ex ante* proposals cannot be dismissed categorically simply because every case has idiosyncrasies.

## C.     The district court inappropriately disregards out-of-circuit fee awards.

Not only did the district court discount market proposals in favor of *ex post* fee awards, it also discounted all orders that awarded less than 33%! The court remarkably found that "to the extent that courts in other circuits have awarded percentages smaller than what Appointed Counsel seek here, the Court finds those awards and their reasoning relatively unpersuasive." A12.

Relying on putative expert declarations that Andren had no opportunity to rebut, the district court asserted that fee award in other circuits are "infected by default rules recommending small attorney fee award percentages for 'megafunds.'" A11. Because these courts do not follow the Seventh Circuit's "market" approach, these awards were discounted in favor of the supposed best evidence of market rates— Seventh Circuit district court awards, which so happen to have always approved 30% or greater fee awards in antitrust cases.

Under this reasoning, every court in this Circuit must issue 33⅓% fee awards because neither other courts' awards, nor attorneys' own bids constitute "market" rates—the only market rate is past fee awards, which were and forever shall be 33⅓%.

The district court makes two fundamental mistakes. *First*, no court order—even within the Seventh Circuit—embodies the *ex ante* market rate when issuing orders *ex post*. *Second*, while other circuits do not strive to award the market rate, their fee awards inform attorneys within the national market for skilled antitrust counsel.

With the exception of unexpected transfers, attorneys can choose to work on cases within any circuit, and it turns out that they work prolifically on cases within the Ninth Circuit. In response to the district court ordering disclosure, Class Counsel identified 94 fee requests and awards since the initiation of this suit. A186-A198. Class Counsel applied for the 94 awards in 40 distinct actions. (Many requests, including 23 distinct awards listed from the *Automotive Parts Antitrust Litigation* (E.D. Mich.), consist of piecemeal awards over multiple settlement tranches. Other awards represent instances where the two Class Counsel firms represented different subclasses, such as *Aggrenox Antitrust Litigation* (D. Conn.), which awarded Hagens Berman 20% (A187) and Cohen Milstein 33.33% (A194).) Of the 94 fee requests, Class Counsel moved for 28 of them (30%) in the Northern District of California. The 30% figure is the same if measured by distinct litigations: 12 out of 40.

The prevalence of litigation in the Northern District of California is notable for several reasons. *First*, the Northern District of California has more experience overseeing and awarding fees in antitrust litigation. In comparison, Class Counsel identified only two awards from districts within this Circuit, both from *Steel Antitrust Litigation* (A192). Class Counsel discloses no other district to have awarded fees in more than three distinct antitrust matters in this time period. *Second*, only 4 of the 28 fee requests in the Northern District of California have resulted in awards above 29%. *Third*, and most importantly, Class Counsel knows that Ninth Circuit courts generally award 25% or less (A131), and yet these firms work there more extensively than any other circuit by far. Ninth Circuit fee awards undermine class counsel's assertions a 33%

flat fee represents the "market rate." The Ninth Circuit holds that the benchmark fee award for settlements ought to be 25%, and less for very large settlements. *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1297 (9th Cir. 1994). Class Counsel's disclosures prove this.

The district court instead gerrymanders Class Counsel's disclosures. *First*, the court discounts the 28 fee requests "from the Ninth Circuit due to its megafund rule," A13, though the Seventh Circuit effectively has a similar rule. Then the district court purports to discount settlements "less than $50 million, which are not the scale of this case" and finds that "all but one" of the settlements were awarded at least 30% or had awards "greater in absolute amount that what Appointed Counsel seek here." *Id*. Both exclusions make little sense. Smaller settlements *more likely* award larger percentages (precisely because of the megafund rule), but by this technique the district court discounts courts that awarded less for such settlements. *See, e.g.*, A192 (*Blue Cross* (E.D. Mich.) (28.78% award for $8.63 million)). Together these criteria eliminate 73 of the 94 fee requests from consideration, including all examples from the most prolific district.

Even with this gerrymandered sample, the district court miscounts in finding only one example of a non-Ninth Circuit district awarding less than 30% for a settlement fund larger than $50 million and total fee award less than $60 million. At least two did. *See* A187 (*Aggrenox* (D. Conn.); awarding 20%, $29.2 million, instead of requested 33⅓%); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MD 2262 (NRB), 2020 WL 6891417, 2020 U.S. Dist. LEXIS 220369, at *92 (S.D.N.Y. Nov. 24, 2020) ("Based on the above data [other *LIBOR* awards], the 30% fee award EBP Class Counsel request is unreasonably high.") (awarding 25%, $43.3 million, instead of requested 30%) (listed at A192).

Class counsel argued that the benchmark 25% fee employed by the Ninth Circuit was "below market." Name partner Steve Berman submitted a declaration arguing that

in the Ninth Circuit "law firms must bid under 25%, even if this is below the market rate elsewhere." A131. But because there is a national market for antitrust plaintiffs' counsel, Class Counsel's position suggests that antitrust litigation should dry up in jurisdictions imposing below-market rates. The reverse occurs, and Class Counsel provides no evidence that they under-invest in Ninth Circuit cases. Andren does not believe Class Counsel fails to litigate zealously in the Ninth Circuit. Nor does Class Counsel assert that complex antitrust litigation is significantly more costly in the Seventh Circuit than in the Ninth Circuit. (Hotel pricing alone suggests the opposite.) Class Counsel has litigated prolifically and continues to see appointments in the Ninth Circuit. A148.

Berman asserted that rates below 25% were "less than the market will bear." A131. Berman did not explain why his colleague went out of her way to reference the 25% benchmark when seeking appointment in this very case. At the time, the court was concerned that appointment of a third interim class counsel group would increase attorneys' fees, but Hagens Berman attorney Elizabeth Fegan reassured the district court that "[a]t the end of the day, there's a certain amount of damages that defendants are going to be liable for. This Court may… award a fee – a percentage award fee that might be 25 percent." Dkt. 245 at 25-26. If the firm's belief was that 25% was below market, it makes little sense why counsel would refer to that figure at the hearing. And all of this would have come out had the district court honored Andren's offer of proof.

Regardless, the "market" has little to do with court-ordered attorneys' fee awards. As Andren explained in his offer of proof, "less than the market will bear" is nothing but a euphemism for "rates awarded by courts *ex post* in antitrust cases without *ex ante* competitive bids." A149. Given that many fee requests lack any opposition at all—no objector to the Direct Purchaser or Commercial Indirect Class fee awards

emerged as it would've been economically irrational to object—courts will approve a great many things.

The limited disclosure ordered by the district court accords with objectors' offer of proof—33% exceeds the market rate because class counsel zealously represents plaintiffs in districts where lower rates are the legally presumed benchmark.

Nor is the Ninth Circuit an outlier in giving special scrutiny to large fee requests. The empirical data for "megafund" settlements over $100 million shows that a sliding scale typically compensates class counsel. In class actions "fee percentages tended to drift lower at a fairly slow pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20 percent." Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811, 838 (2010). In settlements ranging from $100 million to $250 million, the median award is 16.9% and the mean is 17.9%. *Id*. Other surveys report similar data. *See, e.g.*, Stuart Logan *et al.*, *Attorney Fee Awards in Common Fund Class Actions*, 24 CLASS ACTION REPORTS (March-April 2003) (empirical survey showing average recovery of 15.1% where recovery exceeded $100 million); Eisenberg & Miller, 7 J. EMPIRICAL LEGAL STUD. at 265 tbl. 7 (mean percentage fee in 68 class-action settlements with recovery above $175.5 million was 12% and median award was 10.2% with standard deviation of 7.9%).

To the extent one equates "market rate" to past fee awards as the district court did, these authorities demonstrate that *national* jurisprudence (in the shadow of which knowledgeable clients would negotiate *ex ante*) also manifests a sliding scale like Hagens Berman's bids. Because the 33⅓% fee award disregards diminishing marginal percentages in market-based rates *and* for court scrutiny of megafunds, the fee award should be reversed so that the district court can use the scaling *Synthroid II* endorses and information from past competitive bids to formulate a new fee award. This would likely return tens of millions of dollars for class benefit and does not deter class counsel

from pursuing antitrust litigation, as the continued vibrancy of the Northern District of California proves.

## II.     The district court erred by considering purported expert reports submitted by other parties without notice to class members in this settlement, and without considering Andren's criticisms or permitting Andren discovery.

Class Counsel did not retain a purported expert on attorneys' fee awards, nor did they cite any purported expert reports in their fee motion, yet the district court repeatedly relied on two non-party declarations in its fee award. The Direct and Commercial Indirect Plaintiffs retained Professors Brian Fitzpatrick and Robert Klonoff respectively in support of those plaintiffs' 33⅓% fee requests. Dkts. 5048 & 5050. Despite this, the district court quotes or relies on the Fitzpatrick and Klonoff declarations eleven times in its 13-page order on the End-User Plaintiffs' fee award. A7-A12.

Rule 23(h) requires that objectors know the basis of the attorneys' fee motion so that they can have a meaningful opportunity to object. *Redman v. RadioShack Corp.*, 768 F.3d 622, 637 (7th Cir. 2014); *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993-95 (9th Cir. 2010). Here, neither class notice; nor the district court; nor a single sentence in any of Class Counsel's filings apprised Andren of the bases for fees on which the district court repeatedly relied. For this reason, "objectors were also handicapped by not knowing the rationale that would be offered for the fee request. … There was no excuse for permitting so irregular, indeed unlawful, a procedure." *Redman*, 768 F.3d at 638. Typically, courts find that settling parties breach Rule 23(h) by refusing to timely file motions before the objection deadline, but the same reasoning should apply when a district court independently relies on un-noticed evidence at the direct monetary expense of class members. District courts, after all, must act as "a fiduciary of the class,

who is subject therefore to the high duty of care that the law requires of fiduciaries." *Reynolds v. Beneficial National Bank*, 288 F.3d 277, 280 (7th Cir. 2002).

Even if the district court's unannounced reliance on putative expert declarations submitted by non-parties did not violate Rule 23(h), it should have excluded them from consideration. On main, the declarations opine on law rather than fact, and should not have been relied on for that reason alone. "Courts do not consult legal experts; they are legal experts." *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 662 (7th Cir. 2018). This is a "longstanding rule that expert testimony on issues of domestic law is not to be considered." *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 144 (2d Cir. 2016); *see also Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert' called a judge."). This principle "holds just as true when the finder of fact is the court, if not more so; the court is well equipped to instruct itself on the law." *Stobie Creek Invs., LLC v. United States*, 81 Fed. Cl. 358, 364 (Ct. Fed. Cl. 2008), *aff'd,* 608 F.3d 1366 (Fed. Cir. 2010).

The declarations' conclusions also rely on factual errors, which is why Andren objected to potential reliance on them. A154. For example, Fitzpatrick asserts in his declaration and his attached journal article that declining percentage fee awards are rarely bargained for *ex ante*. A75 (citing Brian Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 FORDHAM L. REV. 1151, 1170 (2021)). Fitzpatrick does not cite or discuss any of the cases when declining scales were offered *ex ante* or negotiated in retention agreements. *E.g.*, *Stericycle*, 35 F.4th at 562; *Optical Disk Drive*, 959 F.3d at 934. Nor does he consider how some sophisticated securities plaintiffs insist on such fee scales in all their litigation categorically.

Fitzpatrick calls competitive bidding "impossible" (A63), but fails to note the legal obstacles that courts rarely use it.[8] When courts do solicit bids including fee terms—as distinguished from a simple-minded auction—it works just fine. Michael Perino, *Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions* (2006) (pre-*Cendant* auctions reduced fees; not cited by Fitzpatrick). Moreover, Fitzpatrick addressed only the Direct Purchaser attorneys who hired him when he opines bidding would have been impossible because "DPP Lead Counsel were the only attorneys who applied to lead the case." A63. In contrast, rival groups *did* apply in both the indirect commercial purchasers *and* indirect end-user purchaser cases. Yet the district court appears to have adopted this argument, even though it does not apply to Class Counsel, when it relies on *Silverman* that "no other law firm was willing to serve as lead counsel." *Compare* A10 (quoting 739 F.3d at 958) *with* A117 (same).

Fitzpatrick's opinion also entails a deterrence-based class-members-don't-matter approach that holds it appropriate to pay the attorneys 100% of the fund. Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?*, 158 U. Pa. L. Rev. 2043, 2047 (2010) (proposing such an approach without mentioning attorneys' fiduciary duties once). It is unsurprising then that he is willing to endorse 33⅓% fee awards— even though his own empirical work shows that a 16-17% fee is more typical in a settlement of this magnitude—and to excuse characteristics that favor a downward adjustment, such as

---

[8] *First*, 15 U.S.C. § 78u-4(a)(3)(B)(v) mandates a procedure for how courts should appoint lead counsel in federal securities class actions, and thus forbids auctions in the type of class action most likely to have competing bids. *In re Cendant Corp. Litig.*, 264 F.3d 201, 273-77 (3d Cir. 2001). *Second*, lead-counsel selection in other cases is a process subject to logrolling and "cartel-like" behavior to deter competitive bids. Burch, *Monopolies*, 70 Vand. L. Rev. at 73; *cf.*, *e.g.*, A149-50.

length of litigation. *See* Fitzpatrick, 7 J. EMPIRICAL L. STUD. at 836, 839; *cf. generally* LESTER BRICKMAN, LAWYER BARONS 337-39 (2011). Similar opinions caused one court to reject Fitzpatrick's opinion and apply its own discretion to award a more reasonable fee than the windfall counsel requested. *E.g., In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 1352859, at *3 (N.D. Cal. Apr. 12, 2017).

Because of these issues, Andren requested that the court disregard the experts, or provide him discovery to further his rebuttal in the event the district court intended to rely on either report. A154. The district court says nothing about Andren's request. The district court erred in relying on the experts at all, but even if bless-these-fees experts have admissible testimony, the award should also be vacated because it foreclosed Andren's opportunity to rebut purported expert testimony containing doubtful factual assertions.

## Conclusion

The fee award should be vacated, and the case remanded to determine an appropriate fee award based on hypothetical *ex ante* market rates rather than slavish imitation of past fee awards. This Court should further instruct that, if courts do rely on past fee awards as data points, they should not arbitrarily gerrymander the sampling of those awards. On remand, the district court should not rely on evidence challenged by objectors without permitting discovery.

Dated: December 19, 2022          Respectfully submitted,

HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS

/s/ Theodore H. Frank
Theodore H. Frank
1629 K Street, NW, Suite 300
Washington, DC 20006
(703) 203-3848
Attorneys for Objector-Appellant
    John Andren

## Statement Regarding Oral Argument

Andren requests under Cir. R. 34(f) that the Court hear oral argument in his case because it presents significant issues of attorneys' fees in class-action settlements. Exploration at oral argument would aid this Court's decisional process and benefit the judicial system.

Andren is working with the *pro bono* assistance of the nonprofit Hamilton Lincoln Law Institute's Center for Class Action Fairness. This Court and the national press have repeatedly recognized the Center's good faith in raising these public-policy issues. *See, e.g.*, *In re Stericycle Sec. Litig.*, 35 F.4th 555, 572 & n.11 (7th Cir. 2022) (citing cases); Editorial Board, *The Anthem Class-Action Con*, Wall St. J. (Feb. 11, 2018); Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. Times (Aug. 13, 2013). Neither Andren nor the Center has ever settled an appeal or objection for a *quid pro quo* payment to themselves at the expense of the class; they bring this appeal in good faith.

A favorable resolution in this appeal would provide guidance to district courts in Rule 23(h) requests, and reduce the windfalls achieved by class counsel at the expense of absent class members.

**Certificate of Compliance with Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 30(d)**

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, Type Style Requirements, and Appendix Requirements:

1.    This brief complies with the type-volume limitation of Cir. R. 32(c) because:

This brief contains 13,589 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 12-point Palatino Linotype font.

3.    All materials required by Cir. R. 30(a) & (b) are included in the appendix.

Executed on December 19, 2022.

*/s/ Theodore H. Frank*
Theodore H. Frank

**Proof of Service**

I hereby certify that on December 19, 2022, I caused to be electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Seventh Circuit using the CM/ECF system pursuant to Cir. R. 25(a), thereby effecting service on all counsel of record, who are registered for electronic filing.

/s/ *Theodore H. Frank*

Theodore H. Frank

**Required Short Appendix**

No. 22-2889

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

IN RE: BROILER CHICKEN ANTITRUST LITIGATION

END USER CONSUMER PLAINTIFF CLASS,
Plaintiffs-Appellees
v.
FIELDALE FARMS CORPORATION, et al.,
Defendants.

APPEAL OF: JOHN ANDREN,
Objector-Appellant.

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:16-cv-08637
Judge Thomas M. Durkin

Appendix of Objector-Appellant John Andren
(Pages A17 – A205)

HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
Theodore H. Frank
1629 K St. NW, Suite 300
Washington, D.C. 20006
(703) 203-3848
ted.frank@hlli.org
*Attorneys for Objector-Appellant*
*John Andren*

## Statement of Compliance
## with Circuit Rule 30(d)


All materials required by Cir. R. 30(a) & (b) are included in the

Appendix of Objector-Appellant John Andren.


/s/ *Theodore H. Frank*

Theodore H. Frank

Hamilton Lincoln Law Institute

Center for Class Action Fairness

1629 K Street, NW Suite 300

Washington, DC 20006

(703) 203-3848


*Attorneys for Objector-Appellant*

  *John Andren*

APPENDIX
TABLE OF CONTENTS
Required Short Appendix

Appendix Page

Order of The Honorable Thomas M. Durkin
  filed August 30, 2022 (Docket No. 5798) ...................................................A1

Memorandum Opinion and Order of
The Honorable Thomas M. Durkin
  filed October 7, 2022 (Docket No. 5855) ................................................. A4

APPENDIX
TABLE OF CONTENTS

Appendix Page

Relevant Docket Entries .................................................................... A17

Minute Entry of
The Honorable Thomas M. Durkin
Re: Application of a Sliding Scale in Awarding Class Counsel Fees
        filed August 4, 2021 (Docket No. 4915) ............................................. A56

Direct Purchaser Plaintiffs' Response to the Court's Order Regarding
Allocation of a Sliding Scale to their Motion for Attorneys' Fees
        filed September 15, 2021 (Docket No. 5048)

    Exhibit:

    1. Declaration of Brian T. Fitzpatrick Regarding Direct
    Purchaser Plaintiffs' Motion for Attorneys' Fees
            signed September 14, 2021 (Docket 5048-1).............................A57

John Andren's Objection to Motion for Attorneys' Fees,
Costs, and Service Award
        filed November 11, 2021 (Docket No. 5182) .......................................A79

    Exhibits:

    A. Notice of Filing of *in Camera* submission,
    Originally Filed May 13, 2010, in *In re Optical
    Disk Drive Products Antitrust Litig.*, 10-md-2143 (N.D. Cal.)
            exhibit filed November 11, 2021 (Docket No. 5182-4)..............A98

B. Declaration of Steve W. Berman in Support of
Application to Appoint Hagens Berman as Interim
Class Counsel, Originally Filed March 28, 2013 in *In re
Lithium Ion Batteries Antitrust Litig.*, 13-md-2420 (N.D. Cal.)
     exhibit filed November 11, 2021 (Docket 5182-5) ...................A102

Memorandum Opinion and Order of
The Honorable Thomas M. Durkin
Re: Fees for Direct Purchaser Plaintiffs' Counsel
     filed November 30, 2021 (Docket No. 5225) ..................................... A111

Declaration of Steve W. Berman in Support of End-User
Consumer Plaintiffs' Motion for Final Approval and for
Attorneys' Fees, Costs, and Service Awards
     filed December 6, 2021 (Docket No. 5250) .........................................A124

Objector Andren's Motion to Continue Hearing With Respect
to Attorneys' Fees and to Compel Interrogatory Responses
     filed December 17, 2021 (Docket No. 5294) ......................................A136

    Exhibits:

    1. Declaration of M. Frank Bednarz and Offer of Proof
       filed December 17, 2021 (Docket 5294-1) ................................A144

    2. Objector Andren's Proposed First Set of Interrogatories
    to End User Consumer Plaintiffs dated November 10, 2021
       filed December 17, 2021 (Docket 5294-2) ................................A155

    6. Objector Andren's Proposed Second Set of Interrogatories
    to End User Consumer Plaintiffs dated December 16, 2021
       filed December 17, 2021 (Docket 5294-6) ................................A162

Order Granting End-User Consumer Plaintiffs' Motion
for Final Approval of the Class Action Settlements Entered by
The Honorable Thomas M. Durkin
        filed December 20, 2021 (Docket No. 5304) .......................................A172

End-User Consumer Plaintiffs' Response
to the Court's August 30, 2022 Order
        filed September 23, 2022 (Docket No. 5818)  ....................................A181

        Exhibits:

        Amended Exhibit A (Table of Past Fee Awards)
                filed under seal September 26, 2022 (Docket No. 5823).........A185

        Exhibit B (Table of Past Fee Awards)
                filed under seal September 23, 2022 (Docket No. 5820).........A190

        Exhibit E (Proposal Submitted *in Camera* in
        *Microsystems Development Rechnologies, Inc. v.*
        *Panasonic Corporation*, No. 15-cv-3820 (N.D. Cal.),
        Originally Submitted November 20, 2015)
                filed under seal September 23, 2022 (Docket No. 5821).........A199

Minute Entry of
The Honorable Thomas M. Durkin
        filed October 3, 2022 (Docket No. 5828) ........................................... A204

John Andren's Notice of Appeal
        filed October 21, 2022 (Docket No. 6094) ...........................................A205

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE BROILER CHICKEN ANTITRUST
LITIGATION

No. 16 C 8637

Judge Thomas M. Durkin

ORDER

Prior to the Court's recent certification of the End User class, the Court approved the class's settlement with several defendants. Class counsel also sought an interim fee award. Shiyang Huang and John Andren each filed objections to the fee award.

As an initial matter, Huang and Andren argue that the costs sought by class counsel should be subtracted from the total settlement amount before a fee award percentage is applied. The Court agrees for the reasons stated in the Court's order of November 30, 2021, which awarded fees to counsel for the Direct Purchaser Class. *See* R. 5225. The Court will follow the same formula here.

As for the proper fee award, Andren seeks to compel answers to interrogatories it served on the class and counsel. The Court agrees with Andren that some of the information sought by the interrogatories would be helpful to the Court in determining the "market rate" for counsel's work, as the Seventh Circuit has instructed. Specifically, the Court orders class counsel (meaning both firms Hagens Berman and Cohen Milstein) to produce the following information submitted to, or

**A1**

ordered by, a court from September 2, 2016 (which is the date this case was filed) to present:

- every fee bid made by counsel in an antitrust case;

- every fee award granted to counsel in an antitrust case;

- for any bid or award, the case name, number, district, and relevant docket entry numbers; and

- for any award, the lodestar amount and the award percentage sought by counsel.

In sum and substance, this is the information Andren seeks in his first set of interrogatories. This information is relevant to the market rate for counsel's work and will be helpful to the Court's analysis.

Andren's second set of interrogatories, however, go far beyond this and seek information about how class counsel determines their fee bids, and communications class counsel has had with other attorneys regarding bids and awards. This case is not an investigation into the conduct of class counsel with respect to seeking appointments and fees generally. The issue here is specifically the appropriate fee award for this settlement. Relevance for discovery purposes must be understood in that context. There is no allegation that class counsel has acted inappropriately in any way at all, so information beyond actual bid and award amounts is not discoverable on this motion.

Additionally, the Court finds that interrogatories are not the appropriate form for discovery in this context. Instead, class counsel should submit this information to the Court in a filing under seal by September 23, 2022 or sooner. To the extent the

**A2**

objectors or any counsel on the case are unable to access a filing under seal, the End Users' counsel should email this filing to them.

Therefore, Andren's objection [5182] and Huang's objection [5167] are granted in part and denied in part in accordance with this order. Andren's motion to continue the fee hearing [5294] is granted. Huang's motion to reconsider the settlement approval, and to alter and amend the judgment [5312] is denied for the reasons the Court gave in certifying the class, which Huang conceded would be appropriate. *See* R. 5312 at 1. The questions of awards for objectors and class representatives will be decided along with determination of fees for class counsel after the Court has had the opportunity to review the information the Court has ordered class counsel to produce.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: August 30, 2022

**A3**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE BROILER CHICKEN ANTITRUST
LITIGATION

No. 16 C 8637

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

In this lawsuit alleging a price-fixing conspiracy in the chicken industry against more than 20 defendants, the Court appointed the law firm Hagens Berman Sobol Shapiro LLP as interim counsel to represent a putative class of end-user consumer plaintiffs (the "End Users"). *See* R. 248. On December 20, 2021, the Court approved settlements for the End Users that interim counsel negotiated with six defendant corporate families, totaling $181 million, *see* R. 5304, while the case continues to proceed against the remaining defendants.[1] In approving the settlements, the Court appointed Hagens Berman and the law firm Cohen Milstein Sellers & Toll PLLC as co-lead counsel for the settlement class ("Appointed Counsel"). Following that order, the Court certified the End User Class on May 27, 2022. *See* R. 5644.

---

[1] This Court granted final approval to settlements with: Fieldale Farms Corporation ("Fieldale"); George's Inc. and George's Farms, Inc. ("George's"); Mar-Jac Poultry, Inc., Mar-Jac AL/MS, Inc., Mar-Hac Holdings, Inc; Mar-Jac Poultry AL, LLC, Mar-Jac Poultry MS, LLC, and Mar-Jac Poultry, LLC ("Mar-Jac"); Peco Foods, Inc. ("Peco"); Pilgrim's Pride Corporation ("Pilgrim's"); and Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., and Tyson Poultry, Inc. ("Tyson"). R. 5304.

Appointed Counsel seek an interim award of attorney's fees and costs and incentive awards for the 26 named class representatives. R. 5160. Two objections were filed, and one of the objectors sought discovery on issues related to counsel's fees. After briefing on the objections and whether discovery was proper, the Court ordered Appointed Counsel to disclose certain information about their prior fee requests and awards in other antitrust cases, and their agreements with the named plaintiffs in this case. R. 5798; R. 5818; R. 5835. Appointed Counsel's motion for fees and costs and incentive awards is granted in accordance with this order.[2]

## Background

Without the benefit of a prior government investigation to guide them, Appointed Counsel sought to represent a class of consumers in this case shortly after it was filed in September 2016. Since then, the Court has appointed counsel for three classes and more than 100 entities have opted out of the classes to file their own direct actions. The more than 20 defendants are represented by some of the most prominent law firms in the country.

Appointed Counsel successfully defended the case against a significant motion to dismiss and achieved class certification. They have shepherded the case through extensive discovery, as is recounted in the declaration supporting their motion, *see* R.

---

[2] The Court entered an opinion and order on November 30, 2021 awarding fees and costs to counsel for the Direct Purchaser Class resulting from a group of settlements. *See* R. 5225. Because the relevant legal issues are the same here, and the Court's analysis of those issues has not changed, the Court could simply incorporate by reference the prior opinion. Instead, this opinion largely tracks that opinion to provide a self-contained record of the Court's decision on this motion.

5161-1, and is reflected in the more than 5,800 docket entries that make up the case, including 18 scheduling orders. Appointed Counsel have briefed numerous motions in addition to the motions to dismiss and for class certification.

Appointed Counsel have been assisted by four other firms. Appointed Counsel and the assisting firms have submitted their hours for the Court's review on a quarterly basis. Their collective lodestar is 67,522.2 hours representing $32,853,802.00 in fees. *See* R. 5161-1 ¶ 17.

Appointed Counsel seek a fee award of 33% of the settlement total of $181 million, or $59,730,000.00. They also seek payment of $8.75 million of the more than $9 million in litigation expenses they have incurred. And they seek a $2,000 incentive award for each of the named class representatives.[3] As of December 6, 2021, 1.2 million class members filed claims, with only seven opt-outs and three objections. *See* R. 5248 at 15.

## Analysis

It is customary for class counsel in large and complex cases to seek an interim fee award. *See, e.g., Kleen Prod. LLC v. Int'l Paper Co.*, 2017 WL 5247928, at \*4 (N.D. Ill. Oct. 17, 2017); *see also In re Endotronics, Inc.*, 1989 WL 6746, at \*1 (D. Minn. Jan.

---

[3] The named plaintiffs are: Ian Adams; Angela Ashby; Linda Cheslow; Kenneth Cote; Kristin Davis; Abraham Drucker; James D. Flasch; Cristina Hall; Matthew Hayward; Richard Heftel; Stephen Holt; Joshua Madsen; William David Marino; Dorothy Monahan; Dina Morris; Alison Pauk; Daniel Percy; Michael Perry; Catherine Senkle; Diane Spell; Margo Stack; Marilyn Stangel; Eric Thomas; David Weidner; Leslie Weidner; and Natalie Wilbur. *See* R. 4921-1. Two of the class representatives are a married couple, and counsel has stated that they will share one incentive award. *See* 5835. Thus, the total amount of incentive award money is $2,000 multiplied by 25, or $50,000.

30, 1989) ("Untoward delay could discourage [class counsel] from engaging in matters such as these. The Court, therefore, must have discretion to award interim fees and costs."). The "starting point" for determining such an award is the "market rate" for such services. *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001); *see also Silverman v. Motorola Sols., Inc.,* 739 F.3d 956, 957 (7th Cir. 2013) ("[A]ttorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing sellers of legal services."); *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011) ("[T]he district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys."). Estimation of the market rate "is inherently conjectural," *In re Trans Union Corp. Priv. Litig.*, 629 F.3d 741, 744 (7th Cir. 2011), because "there is no market in class cases." Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151, 1155 (2021).[4] But the Seventh Circuit has explained that the goal of approximating the market rate can be "informed by a number of factors, including: (1) the actual agreements between the parties as well as fee agreements reached by sophisticated entities in the market for legal services; (2) the risk of non-payment at the outset of the case; (3) the caliber of Class Counsel's performance; and [4] information from other cases, including fees awarded in

---

[4] Professor Fitzpatrick also filed a declaration in support of the Direct Purchaser Plaintiffs' class counsel's motion for fees. *See* R. 5048-1. At the Court's invitation, the Commercial and Institutional Indirect Purchaser Plaintiffs also submitted an expert declaration on the previous motion by Professor Robert Klonoff. *See* R. 5050-1. The Court has referenced and cited these declarations in deciding this motion as well.

A7

comparable cases." *Hale v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 6606079, at *8 (S.D. Ill. Dec. 16, 2018) (citing *Synthroid*, 264 F.3d at 719)).

### A. Actual Agreements

Appointed Counsel's agreements with the named plaintiffs simply provide that they will take a percentage of any recovery as determined by the Court. *See* R. 5835. No other actual agreements have been presented to the Court.

There is, however, case law describing court-ordered auctions in which potential class counsel bid for appointment. *See In re Cap. One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 800 (N.D. Ill. 2015) (collecting cases, including *In re Amino Acid Lysine Antitrust Litig.*, 918 F. Supp. 1190 (N.D. Ill. 1996)). The courts in *In re Amino Acid* and the other cases collected by *In re Capital One* sought fee award structure bids from attorneys hoping to represent the classes in those cases. The courts in those cases chose counsel who submitted declining fee scale award structures. (In other words, counsel proposed that their fee percentage decrease as the settlement amount increased.) These cases are relatively outdated, none being less than 20 years old. *See* R. 5048-1 ¶ 8, Fitzpatrick Decl. (court "experimentation with auctions has all but ceased"). However, Appointed Counsel have bid a declining fee scale in at least three other cases within the last ten years. *See* R. 5818-3 (*In re Optical Disk Drive Prods. Antitrust Litig.*, Case No. 10-MD-2134-VRW (N.D. Cal.)); R. 5818-4 (*In re Lithium Ion Batteries Antitrust Litig.*, Case No. 13-MD-2420-YGR (N.D. Cal.)); R. 5821 (*Microsystems Devel. Tech., Inc. v. Panasonic Corp.*, No. 15-cv-03820-RMW (N.D. Cal.).

The Court does not put much stock in these bids. First, the most recent is more than seven years old. Furthermore, the Seventh Circuit has explained that declining fee scale award structures do not reflect market realities and impose a perverse incentive "ensuring that at some point attorneys' opportunity cost will exceed the benefits of pushing for a larger recovery, even though extra work could benefit the client." *Synthroid*, 264 F.3d at 721; *see also Silverman*, 739 F.3d at 957 ("[S]olvent litigants do not select their own lawyers by holding auctions, because auctions do not work well unless a standard unit of quality can be defined and its delivery verified. There is no 'standard quantity' of legal services, and verification is difficult if not impossible."). "Subsequent cases within the Seventh Circuit have similarly recognized that the auction concept is flawed[.]" R. 5050-1 at 17 n.15, Klonoff Decl. Of course, when confronted with a court ordered competitive auction that permits declining scale bids, some attorneys will likely make such a bid in order to win the auction. But for the reasons expressed by the Seventh Circuit, the Court questions whether it is appropriate to permit declining scale bids in an auction. Thus, cases with auctions that permitted such bids carry little weight in the Court's consideration here.

**B.** **Risk of Non-Payment &**
**Caliber of Class Counsel's Performance**

A declining scale fee award structure might be appropriate in cases in which settlement is a more likely outcome and in which the "marginal costs" of increasing the settlement recovery amount are low. *See Silverman*, 739 F.3d at 959. As Professor Fitzpatrick surmised, this "may explain the use of [declining scale fee award

**A9**

structures] in the two [Telephone Consumer Protection Act] cases" noted above. *See* R. 5048-1 at 17 n.6, Fitzpatrick Decl.; *see, e.g.*, *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 236 (N.D. Ill. 2016), and *In re Cap. One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 805 (N.D. Ill. 2015). Unlike TCPA cases in which "settlement was likely," *Gehrich*, 316 F.R.D. at 230, settlement in a complex antitrust case like this is far from a foregone conclusion. *See* R. 5050-1 ¶ 37, Klonoff Decl. ("In terms of risk and complexity, TCPA cases are the polar opposite of the present case, a complicated multi-party antitrust conspiracy case.").[5] Appointed Counsel invested massive resources of time and money when few other counsel expressed interest, with little assurance of success. *See Silverman*, 739 F.3d at 958 ("When this suit got under way, no other law firm was willing to serve as lead counsel. Lack of competition not only implies a higher fee but also suggests that most members of the securities bar saw this litigation as too risky for their practices."). As noted, no government investigation preceded the complaint in this case for Appointed Counsel to piggy-back. And Plaintiffs have been opposed by many defendants, including a number of very large and well-funded corporations, which have retained some of the most prominent and sophisticated law firms in the United States. The Court's 92-page decision denying the motions to dismiss was a relatively close call. Discovery proceeded while the motions to dismiss were briefed and decided, so Appointed Counsel was immediately incurring costs of time and money without any assurance of an award. Furthermore,

---

[5] Moreover, research by both Professors Fitzpatrick and Klonoff shows that the use of declining sliding scale fee awards in the Seventh Circuit is rare. *See* R. 5048-1 at 13 n.5, Fitzpatrick Decl.; R. 5050-1 at 26-31, Klonoff Decl.

issues raised in the motions to dismiss show that success on summary judgment, let alone trial, is no guarantee.

Appointed Counsel have devoted thousands of hours to this case. Their performance to date has been exemplary. The road to some of the settlements was eventually smoothed by later criminal indictments and corporate plea agreements. But Appointed Counsel's work appears to have prompted the government investigations that led to those indictments, rather than the reverse. A substantial award is warranted here as a proper incentive for high quality counsel to take on complex cases, requiring a massive investment of time and money, with such a high risk of non-payment.

### C.    Fee Awards in Comparable Cases

The Seventh Circuit has recognized that academic studies of attorney fees awards in common fund class settlement cases reveal a declining percentage with the size of the settlement. *See Silverman*, 739 F.3d at 959. But as Professor Fitzpatrick noted, "these findings are based on fee awards from other Circuits . . . that are not even trying to capture how clients pay lawyers in the market like the Seventh Circuit does." R. 5048-1 at 20 n.7, Fitzpatrick Decl. These decisions are infected by default rules recommending smaller attorney fee award percentages for "megafunds." *See*, *e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 123 (2d Cir. 2005) (affirming a 6.5 percent fee award from a common fund over $3 billion, reasoning that "the sheer size of the instant fund makes a smaller percentage appropriate"); *Dial Corp. v. News Corp.,* 317 F.R.D. 426 (S.D.N.Y. 2016) ("[I]n class actions where the

**A11**

recovered settlement fund runs into the multi-millions, courts typically decrease the percentage of the fees amount as the size of the fund increases."). The Seventh Circuit has expressly rejected a megafund rule because, as already noted, it is a perverse incentive. *See Synthroid*, 264 F.3d at 718 (reversing district court's fee award in part because it imposed a lower fee percentage because the settlement fund was more than $100 million, holding that "[m]arkets would not tolerate that effect"). Clients generally want to incentivize their counsel to pursue every last settlement dollar, and a declining percentage award operates to the contrary. Thus, to the extent that courts in other circuits have awarded percentages smaller than what Appointed Counsel seek here, the Court finds those awards and their reasoning relatively unpersuasive.

Most persuasive are the large number of antitrust cases in this circuit that have awarded one-third of the common fund as attorney's fees. *See* R. 5050-1 at 45-46 (table citing cases), Klonoff Decl. The fact that fee awards in antitrust cases in this circuit are almost always one-third is a strong indication that this should be considered the "market rate." *See* R. 5048-1 ¶ 14, Fitzpatrick Decl. (in "a series of antitrust class actions . . . . recover[ing] more than $2 billion . . . . *not a single class member ever objected* to the fee request in any of these cases" showing that "sophisticated corporations are happy to play flat fees of 33.33% and they are happy to do so even in the largest cases.").

Additionally, Appointed Counsel's requested fee award is in line with awards they have received in cases of similar magnitude. In response to an Objector's motion for discovery on this motion, *see* R. 5182, the Court ordered Appointed Counsel to

submit data regarding fees they have been awarded in antitrust cases since the inception of this case, *see* R. 5798. Appointed Counsel submitted two charts containing this information. *See* R. 5820; R. 5823. In reviewing this information, the Court discounted awards from the Ninth Circuit due to its megafund rule, and cases in which the settlement amount was less than $50 million, which are not of the scale of this case. Of the 18 remaining awards, all but one were either for at least 30% of the settlement fund or were greater in absolute amount than what Appointed Counsel seek here. The Objector sought this discovery insisting that Appointed Counsel's fee request was "exorbitant" and "substantially above-market," and demanding that "there must be consequences" for such "selfish" conduct. *See* R. 5182 at 6, 15. But in large cases like this, the only available evidence of the "market rate" is past awards. And Appointed Counsel's fee request here is well within the range of awards they have received since 2016. The Court has no reason to characterize the request as "exorbitant" or "selfish."

There is simply little to no precedent recommending anything other than an award of 30-33 percent. With this being the only real evidence of the "market rate," the Court will grant Appointed Counsel's motion for 33% of the relevant fund amount.

**D.    Expenses**

Appointed Counsel seek $8.75 million out of more than $9 million in expenses. Appointed Counsel informed the class that they would not seek to recover the full amount of their expenses at this time. *See* R. 5161 at 18. The request for $8.75 million in expenses is granted.

Expenses, however, should be deducted from the common fund before the fee award percentage is applied. The "ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received." *Redman v. RadioShack*, 768 F.3d 622, 630 (7th Cir. 2014). Out-of-pocket costs, although paid through the settlement fund, are not benefits to the class and thus not part of "what the class members received." *Id.*; *see also In re Wells Fargo Secs. Litig.*, 157 F.R.D. 467, 471 (N.D. Cal. 1994) ("If an attorney risks losing some portion of his fee award for each additional dollar in expenses he incurs, the attorney is sure to minimize expenses."). Therefore, Appointed Counsel will be paid fees of 33% of the settlement fund minus $8.75 million in expenses.

### E.    Named Plaintiff Incentive Awards

"Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). "To determine if an incentive award is warranted, a district court evaluates the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, 897 F.3d 825, 834 (7th Cir. 2018) (citing *Cook*, 142 F.3d at 1016). Incentive awards based on a percentage of the settlement fund "are disfavored, if not altogether forbidden." *See* William B. Rubenstein, 5 Newberg on Class Actions § 17:16

(5th ed. 2018); *see also In Re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 2021 WL 5369798, at *7 (D. Kan. Nov. 17, 2021).

According to Appointed Counsel, each named plaintiff has spent at least 40 hours on the case. *See* R. 5161 at 20. Each named plaintiff was required to comply with discovery including a deposition. *Id.* This is not an insignificant burden for individual people to bear. Furthermore, an award of $2,000 for each named plaintiff is less than is customary. *See* William B. Rubenstein, 5 Newberg on Class Actions § 17:1 (5th ed. 2018) ("Empirical evidence shows that incentive awards are now paid in most class suits and average between $10-$15,000 per class representative."); *see also In re Potash Antitrust Litig.*, No. 1:08-cv-06910 (ECF No. 589) (N.D. Ill. June 12, 2013) ($15,000 awarded to named plaintiffs from a $90 million settlement). The Court finds that $2,000 per named plaintiff is a reasonable award.

## Conclusion

Therefore, Appointed Counsel's motion [5160] is granted as follows: (1) expenses are awarded in the amount of $8.75 million; (2) incentive awards in the amount of $2,000 are awarded to each of the 24 class representatives, with a twenty-fifth $2,000 award being shared by class representatives David and Leslie Weidner; and (3) attorney's fees are awarded in the amount of $57,400,000.00, which is 33 percent of the settlement fund after deducting the expenses and incentive awards. Lastly, while the Court appreciates the spirit of the objections, including the most recent filing of October 6, 2022, *see* R. 5836, they were not material to a case of this

size, alleging antitrust violations, subject to Seventh Circuit precedent, so no objector "incentive award" is appropriate.

ENTERED:

_Thomas M Durkin_
_____
Honorable Thomas M. Durkin
United States District Judge

Dated: October 7, 2022