No. 22-2889

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

*IN RE:* BROILER CHICKEN ANTITRUST LITIGATION

END USER CONSUMER PLAINTIFF CLASS,

Plaintiffs-Appellees

v.

FIELDALE FARMS CORPORATION, et al.,

Defendants.

APPEAL OF: JOHN ANDREN,

Objector-Appellant.

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:16-cv-08637
Judge Thomas M. Durkin

Reply Brief of Appellant John Andren

HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
M. Frank Bednarz
1440 W. Taylor Street, #1487
Chicago, IL 60607
(801) 706-2690
frank.bednarz@hlli.org

HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
Theodore H. Frank
1629 K St. NW, Suite 300
Washington, D.C. 20006
(703) 203-3848
ted.frank@hlli.org
*Attorneys for Objector-Appellant
    John Andren*

## Table of Contents

Table of Contents ................................................................................................ i

Table of Authorities ............................................................................................ ii

Introduction ........................................................................................................ 1

Argument ............................................................................................................ 3

I.     The district court misapplied Seventh Circuit law by giving inadequate
       weight to Hagens Berman's recent fee proposals, which were the best
       evidence of *ex ante* market rates................................................................ 3

II.    Plaintiffs miss the point when defending the district court's erroneous
       refusal to look at lower fee percentages from out of circuit. ................... 12

III.   The district court's reliance on expert reports plaintiffs neither submitted
       nor noticed to the class violated *Redman* and Rule 23(h). ...................... 15

Conclusion ......................................................................................................... 19

Certificate of Compliance with Fed. R. App. P. 32(a)(7)(C) ............................. 21

Proof of Service................................................................................................. 22

# Table of Authorities

Cases

*In re Amino Acid Lysine Antitrust Litig.,*
918 F. Supp. 1190 (N.D. Ill. 1996) ...............................................................8

*Americana Art China Co. v. Foxfire Printing,*
743 F.3d 243 (7th Cir. 2014) ........................................................................2

*Arkansas Teachers Ret. Sys. v. State St. Corp.,*
512 F. Supp. 3d 196 (D. Mass. 2020)..........................................................13

*Brytus v. Spang & Co.,*
203 F.3d 238 (3d Cir. 2000) .........................................................................9

*Dennison v. MONY Life Ret. Income Sec. Plan for Emps.,*
710 F.3d 741 (7th Cir. 2013) ......................................................................17

*DiLeo v. Ernst & Young,*
901 F.2d 624 (7th Cir. 1990) ......................................................................10

*Fox v. Vice,*
563 U.S. 826 (2011)................................................................................... 1-2

*Glover v. Carr,*
949 F.3d 364 (7th Cir. 2020) ...................................................................3, 5

*Golan v. Saada,*
142 S. Ct. 1880 (2022)................................................................................15

*Johnson v. Acevedo,*
572 F.3d 398 (7th Cir. 2009) ......................................................................13

*Johnson v. NPAS Solutions, LLC,*
975 F.3d 1244 (11th Cir. 2020) .............................................................14-15

*Kirchoff v. Flynn*,
  786 F.2d 320 (7th Cir. 1986) ............................................................................5

*In re Lithium Ion Batteries Antitrust Litig.*,
  Nos. 21-15120, 21-15200,
  2022 U.S. App. LEXIS 31616 (9th Cir. Nov. 16, 2022)........................... 6, 8-10, 13, 19

*In re Mercury Interactive Corp. Sec. Litig.*,
  618 F.3d 988 (9th Cir. 2010) ..........................................................................15

*In re Optical Disk Drive Prods. Antitrust Litig.*,
  No. 10-md-2143, 2010 U.S. Dist. LEXIS 146768 (N.D. Cal. June 4, 2010)..................7

*In re Optical Disk Drive Prods. Antitrust Litig.*,
  959 F.3d 922 (9th Cir. 2020) ..................................................................... 6-8, 19

*Parklane Hosiery Co. v. Shore*,
  439 U.S. 322 (1987)........................................................................................18

*Pickett v. Sheridan Health Care Ctr.*,
  664 F.3d 632 (7th Cir. 2011) ............................................................................3

*Redman v. RadioShack Corp.*,
  768 F.3d 622 (7th Cir. 2014) .....................................................................15, 18

*Reynolds v. Beneficial National Bank*,
  288 F.3d 277 (7th Cir. 2002) ..........................................................................10

*Silverman v. Motorola Sols., Inc.*,
  739 F.3d 956, 959 (7th Cir. 2013) .................................................... 7-10, 14, 18

*In re Sw. Airlines Voucher Litig.*,
  898 F.3d 740 (7th Cir. 2018) .......................................................................2, 6

*In re Stericycle Sec. Litig.*,
  35 F.4th 555 (7th Cir. 2022).................................................... 1, 3, 11-12, 14

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) ("*Synthroid I*")....................................2, 4-8, 11-12, 14-15

*In re Synthroid Mktg. Litig.*,
    325 F.3d 974 (7th Cir. 2003) ("*Synthroid II*") .......................................................... 7-8, 14

*United States v. Patterson*,
    215 F.3d 776 (7th Cir.),
    *rev'd on other grounds,*
    *Patterson v. United States*, 531 U.S. 1033 (2000) ............................................................5

*United States v. Sineneng-Smith*,
    140 S. Ct. 1575 (2020).......................................................................................................18

## Rules and Statutes

16 C.F.R. § 233.3.................................................................................................................13

28 U.S.C. § 1927 ................................................................................................................16

Fed. R. Civ. Proc. 23(g) .................................................................................................. 7-8

Fed. R. Civ. Proc. 23(h) ................................................................................................15, 18

Fed. R. Civ. Proc. 26(b)(4)(E) ...........................................................................................18

## Other Authorities

Fisch, Jill E.,
    *Aggregations, Auctions and Other Developments in the Selection of Lead*
    *Counsel Under the PSLRA,*
    64 Law & Contemp. Probs. 53 (2001) ..........................................................................10

Frankel, Alison,
    *The fight is on for control of RealPage antitrust litigation*,
    Reuters (Jan. 10, 2023)..................................................................................13

## Introduction

Plaintiffs, citing *Stericycle*, try (PB15)[1] to shoehorn the district court's decision as an exercise of discretion. *In re Stericycle Sec. Litig.*, 35 F.4th 555, 559 (7th Cir. 2022). Andren agrees that *Stericycle* controls. "A district court abuses its discretion, however, if it 'reaches an erroneous conclusion of law, fails to explain a reduction or reaches a conclusion that no evidence in the record supports as rational.'" *Stericycle*, 35 F.4th at 559. *Stericycle* found the identical type of reversible error that Andren flags here: the district court omitted or discounted considerations relevant to the fee award. It thus vacated and remanded because the "district court did not give sufficient weight to evidence of ex ante fee agreements, all the work that class counsel inherited from earlier litigation against Stericycle, and the early stage at which the settlement was reached." *Id.* at 558.

Yes, as plaintiffs note (PB35), "the Supreme Court discourages 'appellate micromanagement' of attorney fee proceedings." *Fox v. Vice*, 563 U.S. 826, 838 (2011). But the very next sentence of *Fox* reads "But the trial court must apply the correct standard, and the appeals court must make sure that has occurred." *Id.* Thus, the Supreme Court unanimously vacated and remanded in *Fox* because the Fifth Circuit was too deferential to the district court. This Court should reject plaintiffs' invitation to ignore its own precedents.

The district court expressly stated that "the only available evidence of 'market rate' is past awards." A13. *Accord id.* ("only real evidence"). Andren criticized this as legal error. OB15-OB40. Plaintiffs do not attempt to defend the district court's error;

---

[1] OB and PB refer to Andren's Opening Brief and Plaintiffs' Response Brief respectively; A and SA to the Addendum/Appendix and Supplemental Appendix.

instead, they assert, notwithstanding the plain language of the opinion, that the district court "did no such thing." PB22-23. Plaintiffs simply fail to grapple with Andren's argument (OB18; OB22-OB24) that other courts' fee awards—even those issued by Seventh Circuit courts—are almost entirely *ex post*, and not market rates.

The lower court held "There is simply little to no [Seventh Circuit district-court] precedent recommending anything other than an award of 30-33 percent. With this being the only real evidence of the 'market rate,' the Court will grant Appointed Counsel's motion for 33% of the relevant fund amount." A13. This reasoning is indefensible under Seventh Circuit law, and Plaintiffs do not attempt to defend it except by characterizing it as weighing "market evidence" and thus putatively entitled to fact-finding deference. *Stericycle* shows that this does not fly. When the district court applies the incorrect methodology, this Court demands better. "A district court abuses its discretion when it reaches an erroneous conclusion of law." *In re Sw. Airlines Voucher Litig.*, 898 F.3d 740, 743 (7th Cir. 2018) (internal quotation omitted) (quoted by plaintiffs at PB21, though omitting this part of the quote). The hosannas to discretion and "substantial deference" (PB32) go to the intensive fact-finding in "estimates in calculating and allocating an attorney's time," not to a district court's legal methodology. *Fox*, 563 U.S. at 838; *see also Americana Art China Co. v. Foxfire Printing*, 743 F.3d 243, 246 (7th Cir. 2014) (fee methodology reviewed *de novo*). "A trial court has wide discretion when, but only when, it calls the game by the right rules." *Fox*, 563 U.S. at 838.

"[A]ny method other than looking to prevailing market rates assures random and potentially perverse results." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001) ("*Synthroid I*"). That's what happened here, and this Court should vacate and remand so that the lower court can determine the fee by the right rules.

**Argument**

I.     **The district court misapplied Seventh Circuit law by giving inadequate weight to Hagens Berman's recent fee proposals, the best evidence of *ex ante* market rates.**

The district court did "not put much stock" in proposals Hagens Berman submitted in international antitrust cases because (1) the "most recent is more than seven years old"; (2) the Seventh Circuit supposedly found the declining percentages "do not reflect market realities and impose a perverse incentive"; and (3), citing the declaration of Prof. Klonoff, "cases within the Seventh Circuit have similarly recognized that the auction concept is flawed." A9. *Each* of these three reasons by itself is legal error; given that these were the only three reasons on which the court "base[d] its decision," the decision cannot stand. *Glover v. Carr*, 949 F.3d 364, 370 (7th Cir. 2020). Plaintiffs simply repeat the legal errors without defending them, and pretend to shoehorn them into a fact-finding exercise. PB23; PB28.

But this is not a case in which the district court made a fact-intensive credibility determination; there was no dispute that these were actual pre-appointment fee proposals by co-lead class counsel. The district court stated its reasoning for giving the offers low weight, and this Court can evaluate that this reasoning is legally erroneous as discussed in Andren's opening brief and below. Failing to "give sufficient weight to evidence of *ex ante* fee agreements" is reversible error. *Stericycle*, 35 F.4th at 558. Plaintiffs cite *Pickett* (PB23), but that case similarly supports reversal. The *Pickett* district court's description of its reasoning left it ambiguous whether its decision hinged on a legal error; that was enough to vacate and remand. *Pickett v. Sheridan Health Care Ctr*., 664 F.3d 632, 645 (7th Cir. 2011). Here, there isn't even an ambiguity; the district court's reasoning is riddled with legal errors.

*First*, Hagens Berman applied for lead-counsel status in this case in 2016. OB5. They and the district court characterize fee proposals from 2010, 2013, and 2015 as "years old." PB23. But plaintiffs do not deny that the relevant *ex ante* date is 2016, and do not deny that there is no record evidence that the antitrust market is different in 2016 from 2010-2015. OB30-OB31. Certainly the district court gave no justification and no *reason* for finding that a 2015 proposal was irrelevant to a 2016 *ex ante* determination. There isn't even any indication that the court thought the right date to evaluate was 2016. The district court gave no *reason* to treat 2010-15 offers as irrelevant to a 2016 case. Plaintiffs similarly offer only an *ipse dixit*. PB23. Yes, antitrust is "difficult and uncertain" and "complex" (PB16), but these were also offers in antitrust cases—and *international* antitrust cases at that. Plaintiffs don't even try to argue there were changes in antitrust law that made a 2016 case different from a 2010 case.

Plaintiffs complain (PB25) that the proposals were not in the Seventh Circuit. While plaintiffs make an argument for why appellate courts might award different *ex post* fees in different circuits, they fail to explain why the *market rates* are different for national firms practicing across the nation. They don't contend that Seventh Circuit antitrust or civil procedure law or hotel prices make it more expensive to litigate here. (San Francisco is not exactly known for being cheap.) And even though the Ninth Circuit has a well-known 25% benchmark (OB37; PB34), there are no shortage of national firms (including Class Counsel) willing to bring antitrust cases in the Ninth Circuit. This shows that 25% is *not* below the market rate—but that 33⅓% is decidedly above market. *See* Section II below. Again: as Andren argued (OB18; OB22-OB24) and plaintiffs never contest, *ex post* court-awarded fees are not "market rates."

*Second,* the district court read *Synthroid I* 180 degrees off from what that decision said. OB26-OB28; 264 F.3d at 721. They admit "Andren is correct" about this. PB28. Seventh Circuit law does not hold that declining fee structures "do not reflect market

realities." *Contra* A9. This is a basic error by the district court, and plaintiffs repeat it. PB23-24. This Circuit has affirmed and been receptive to and even once ordered the application of declining fee scales because evidence shows that knowledgeable clients insist on it. OB28-29; *Stericycle*. That *Synthroid I* doesn't mandate declining percentages (PB29) is beside the point. The district court here erred not because it made a discretionary fact-specific finding that declining percentages would not be market-based in this specific case, but because it premised its reasoning on the legal error that *Synthroid I* precluded considering evidence of previous fee proposals that used declining marginal percentages. *Cf. United States v. Patterson*, 215 F.3d 776, 787 (7th Cir.), *rev'd on other grounds, Patterson v. United States*, 531 U.S. 1033 (2000).

Plaintiffs invent (PB30) reasons why a sliding scale might be inappropriate in a particular case, but none of these were what the district court discussed in its order.[2] Thus, they do not enter the abuse of discretion analysis. *Glover*, 949 F.3d at 370. While no *ex ante* agreement exists in this case, co-lead class counsel's own offers show that a sliding scale is still seen as appropriate in antitrust litigations even more complex than this one. OB20-OB21. (Plaintiffs do not dispute that international antitrust cases are more complex and present more uncertainty than domestic ones. OB33.) Plaintiffs assert but identify nothing that makes a declining bid appropriate in the international

---

[2] *Synthroid I*'s criticism—that "systems with declining marginal percentages are not always best" because they "ensur[e] that at some point attorneys' opportunity costs will exceed the benefit of pushing for a large recovery, even though extra work could benefit the client," 264 F.3d at 721, is odd. That principal-agent problem applies to any contingent fee that is a percentage of the fund, and is not caused by the declining marginal percentage itself. *E.g., Kirchoff v. Flynn*, 786 F.2d 320, 325 (7th Cir. 1986). And the concern can be mitigated by a grid that rewards class counsel with a higher percentage "based on the stage of litigation"—as *Synthroid I* itself recognized, and as two of Hagens Berman's bids proposed. *Id.* at 722; OB9; A87-A91.

complex antitrust litigations in *Optical Disk Drive* or *Lithium Batteries*, but not here. Nothing in the record suggests the declining-proposals in those two cases was somehow the product of coercion, rather than competition. Even if a district court might not choose a sliding scale in its market reconstruction, the presence of one in a proposal is not a reason to disregard the evidence. OB16-OB17. Class counsel's rationalization that the district court implicitly found factual reasons to disregards the proposals do not cure its explicit error of law. Class counsel quotes *Southwest* to argue that an abuse of discretion occurs when a district court "reache[d] a conclusion that no evidence in the record supports as rational," but omits from the same sentence the phrase "reaches an erroneous conclusion of law." PB21 (selectively quoting *Sw. Air.*, 898 F.3d at 743). An "erroneous conclusion of law" is what Andren contends; *Southwest* itself, which reversed a legally-erroneous fee determination, demonstrates this principle.

*Third*, as Andren noted, "the district court confuses the appropriateness of holding auctions with the appropriateness of considering past bids in other cases." OB27. The court finds that "auctions do not work well," and quotes a non-party expert that the concept is "flawed." A9. But these criticisms deal with whether appellate courts should require *auctions*—which Andren does not argue; and which does not directly pertain to whether a fee proposal in a previous case by a respected experienced antitrust firm would be evidence of a market rate for firms of its caliber. Plaintiffs do not contest that *Synthroid I* holds that courts should "examine" proposals "to see what levels of compensation attorneys are willing to accept in competition." 264 F.3d at 721; OB14. Plaintiffs apparently construe the court's discussion of the law as some sort of factual finding, but even accepting this unconvincing characterization *arguendo*, the district court still committed legal error. The court's reasoning is a *non sequitur*: none of the three proposals Andren asked the court to consider arose from an auction. Two fee proposals were unilateral and unsolicited; and the 2010 bid was part of a court-

requested "proposed terms of fees" as part of a standard Rule 23(g) attorney-appointment application, rather than submitted in an "auction." *In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922, 926 (9th Cir. 2020).

Plaintiffs simply repeat the district court's straw man as they argue against auctions. *E.g.*, PB28. But Andren doesn't argue that the court should have held an auction. "Yes, *Silverman* rejects auctions; but Andren did not ask for an auction. Andren asked the district court to follow *Synthroid I*, and consider 'bids … seeking the right to represent a class' as evidence of the market rate. 264 F.3d at 719." OB14. A competitive bid simply allows a court to look at a proposal holistically and maximize information when selecting counsel under Rule 23(g), without being bound to pick the low bidder.[3] This Court approves of competition. "As we remarked the last time around, the outcome of this competitive process among informed buyers and sellers *defines* the market rate for legal services…" *In re Synthroid Mktg. Litig.*, 325 F.3d 974, 976 (7th Cir. 2003) (*Synthroid II*) (emphasis in original). The district court erred in thinking the hypothetical disadvantages of auctions were a reason to disregard competitive fee proposals.

---

[3] For example, Hagens Berman was *not* the least expensive proposal for large recoveries in *Optical Disk Drive*, yet that district court selected it over less sophisticated rivals, just as an in-house counsel might do. *In re Optical Disk Drive Prods. Antitrust Litig.*, 2010 U.S. Dist. LEXIS 146768, at *36 (N.D. Cal. June 4, 2010) (finding lower bid "outweighed by the overall quality and relative sophistication of Hagen Berman's analysis of the potential recovery"). The district court there appropriately avoided problems of simple-minded mechanical auctions where the "judge picks the low bidder." *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 957 (7th Cir. 2013). This is the precise competition that Rule 23(g) envisions when more than one firm seeks lead counsel status, and there is absolutely no reason such Rule 23(g) selection processes can't include fee proposals routinely.

The problems with auctions (PB25) have nothing to do with Hagens Berman's unilateral or *Optical Disk Drive* bids. *Silverman*'s and commentators' concern about auctions is that they might disserve the class by tying the court's hands to select a low bidder who would provide low-quality legal work and sell out cheaply. OB27; *cf. In re Amino Acid Lysine Antitrust Litig.*, 918 F. Supp. 1190, 1198-99 (N.D. Ill. 1996) (considering whether a bid will lead to "slipshod work" and ultimately modifying the selected firm's bid cap because of possible perverse incentives). Competitive bidding processes need not do any such thing.[4] Indeed, class counsel prevailed in *Lithium because*, according to the Ninth Circuit, the *Lithium* district court did not select the Hagens Berman bid. *In re Lithium Ion Batteries Antitrust Litig.*, Nos. 21-15120, -15200, 2022 U.S. App. LEXIS 31616 (9th Cir. Nov. 16, 2022) (unpublished).

Thus, when Plaintiffs assert (PB26-PB27) that *Lithium* rejected Andren's arguments, it's beside the point: the Ninth Circuit does not follow *Synthroid* or a Seventh Circuit market reconstruction approach (a fact that plaintiffs elsewhere acknowledge (PB33)). *Lithium*'s use of the term "market rates" thus differs from what the Seventh Circuit calls "market rates." It is unclear what that unpublished opinion means to describe, but it is definitely not using the term to mean the *ex ante* market-mimicking methodology of this Court, or it would have reached the opposite result.

---

[4] The "judge picks the low bidder" scenario of *Silverman* appears to be a straw man based on the poor argument of the appellant in that case. Counsel has searched and cannot find *any* instance of a court mechanically choosing the lowest bidder without evaluating the other subjective factors Rule 23(g) counsels. But, once again, the appeal does not turn on any of these questions. The issue is not whether "low bidder" auctions or other Rule 23(g) competition is sound public policy, but applying *Synthroid I* to recognize that *previous* competitive fee proposals are probative of "what levels of compensation attorneys are willing to accept in competition"—whether or not the courts that evaluated the proposals chose wisely. 264 F.3d at 721.

*Lithium*'s refusal to command a district court to consider a fee proposal *in the same case* is irrelevant in this Circuit, because *Synthroid I* says that bid data, including bids from different cases, indicate market rates. Plaintiffs are welcome to take that circuit split to the Supreme Court, but *Lithium* reaches a different result under this Circuit's precedent, and plaintiffs don't ask this Court to reconsider *Synthroid I*.

Andren noted (OB32) that "even if this case were riskier than the others [where Hagens Berman submitted fee proposals], a 33⅓% award for a megafund achieved prior to class certification provides no room for larger ethical awards that might be required for longer litigation as a matter of economic incentives." *Cf. generally Brytus v. Spang & Co.*, 203 F.3d 238, 246-47 (3d Cir. 2000) (noting concern about unduly treating class attorneys better at settlement than at litigated judgment). For example, a future fee request for a future *Broiler Chicken* settlement with other defendants now cannot account for the increased risk of successfully seeing the case through the contested class certification motion. Dkt. 5644.

Plaintiffs have no answer for this—other than to ask for deference to a district court's boilerplate recitals about risk, copied almost verbatim from its earlier fee order (*compare* A9-A11 *with* A117-A118), that did not consider this question either. Plaintiffs make much (PB11) of the district court's finding that class counsel "invested massive resources of time and money when few other counsel expressed interest, with little assurance of success." But this finding seems like it deserves less deference when the sentence was cut-and-pasted from the earlier order with one pivotal word changed— "no" to "few." A117 (citing *Silverman*). *Silverman* suggested that a single maverick law firm engaging in an innovative litigation was blazing its own trail and assuming extra risk. "Lack of competition not only implies a higher fee but also suggests that most members of the securities bar saw this litigation as too risky for their practices." 739 F.3d at 958. That just doesn't apply when there *is* competition, when several firms have

filed copycat complaints trying to scrape their own subclass from the original litigants. OB32-OB33; OB5.[5] Again, plaintiffs have no answer for this other than demanding deference to the shoddy reasoning.

> A district judge could not photocopy a lawyer's brief and issue it as an opinion. … From time to time district judges extract portions of briefs and use them as the basis of opinions. We have disapproved this practice because it disguises the judge's reasons …, even when the judge adds some words of his own.

*DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir. 1990). While a district court photocopying reasoning from an earlier opinion involving different parties in a different posture does not suffer the problem of making a judge seem an "advocate's tool," the same reasoning should still apply. Such an opinion implies that the judge has failed to exercise the "high duty of care" demanded of district courts in class action settlement and fee proceedings. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 280 (7th Cir. 2002). The opinion here shows no regard for the fact that the first order was *ex parte* and the new one involves substantive objections that the court ignores, and no regard for why *Silverman* had materially different implications between the two orders.

---

[5] One of the academic concern about auctions is that competition might permit a latecomer firm to free-ride and swipe lead-counsel status from the firm that did the original investigation that developed the theory of the case, thus reducing the incentive to do investigative work in the first place. Jill E. Fisch, *Aggregations, Auctions and Other Developments in the Selection of Lead Counsel Under the PSLRA*, 64 Law & Contemp. Probs. 53, 93-94 (2001). Of course, as both this case (OB5) and *Lithium* (A149-A150; Dkt. 5294-9) show, such machinations are no surprise in the multi-district litigation status quo even without competitive bidding, with Hagens Berman being both a perpetrator and a victim.

Nor do Plaintiffs dispute that the district court attributed "risk" to a strategic decision plaintiffs took that likely reduced their risk. *Compare* A10 *with* OB34.

Plaintiffs' complaint (PB31) that Andren uses the adjective "early" (OB29-30) confuses the calendar with what market-based rates measure. Percentages reflecting "the stage of litigation rather than the calendar are more common in private agreements." *Synthroid I*, 264 F.3d at 722. The stage of the litigation was relatively early, even if the pace of the litigation meant that it took years to reach that early stage. Yes, settlement before class certification and summary judgment motions presents less risk of nonpayment than settlement after those two stages, and Andren does not apologize for pointing that out or objecting that the district court ignored it. The district court erred by disregarding this market-based structure—especially when Hagens Berman does recognize this structure when submitting fee proposals. *E.g.*, OB9.

But all of this flavor is beside the point. While Andren believes the district court clearly erred on these issues, even if this Court grants full deference to the district court's indiscriminate findings of risk, it does not change that the "district court did not give sufficient weight to evidence of ex ante fee agreements," and that is reversible error. *Stericycle*, 35 F.4th at 558. Andren raises it not just for the independent error, but also to demonstrate that plaintiffs' appeals to sympathy are flimsy; applying the law correctly works no injustice and will be no mere technicality.

Rather than looking at the best evidence of a competitive *ex ante* market rate as at least a baseline, the district court found that "in large cases like this," *ex post* fee awards are "the only available evidence of 'market rate.'" A13. *Ex post* fee awards from the courts of a single Circuit are not market rates; the equation of them to market rates is an error of law. Class counsel simply repeats this holding as if it were Andren's strawman rather than a direct quote from the order. PB32. But in fact *ex post* awards are poor evidence of *ex ante* fees, and often sail through uncontested. OB18, OB22-OB24.

Because no *ex ante* market exists, this Court suggests several "benchmarks" to help district courts estimate the market fee: (1) actual fee contracts between (sophisticated) plaintiffs and their attorneys; (2) data from similar common-fund cases when fees were privately negotiated; and (3) information from class-counsel pre-appointment bids for lead counsel status. *Synthroid I*, 264 F.3d at 719-20. While the retention agreements of the unsophisticated consumer plaintiffs in this case included no limitations of fees, the other two benchmarks were available, but the district court pooh-poohed them. Andren agrees that the market-mimicking inquiry is necessarily "flexible." PB35. But it's one thing for a court to be flexible, and another to be so flexible as to bend over backward to ignore the only market-based evidence of a market rate. Courts have no discretion to conduct an "incomplete" analysis. *Stericycle*, 35 F.4th at 560. The district court committed reversible error.

## II.      Plaintiffs miss the point when defending the district court's erroneous refusal to look at lower fee percentages from out of circuit.

Plaintiffs argue (PB33-PB35) that it was appropriate to disregard *lower* awards in other circuits where antitrust cases are more common, because only the Seventh Circuit uses a market-mimicking approach in determining fees. This fundamentally misunderstands the argument why the Ninth Circuit's 25% benchmark is relevant to the market-mimicking approach in the Seventh Circuit. OB36-OB40.

Plaintiffs agree (PB34) that the Ninth Circuit has a 25% benchmark—and one that decreases if there is a megafund. Plaintiffs call this "below market" because the market rate is putatively 30-33%. A131; PB16-PB17. But Plaintiffs do not dispute that they regularly seek work in the Ninth Circuit. OB11; A148.

Simply put, this does not add up. For example, an attorney cannot claim that his market rate is $500/hour if most of his time is spent representing indigents in state court for $53/hour. *Arkansas Teachers Ret. Sys. v. State St. Corp.*, 512 F. Supp. 3d 196, 243 (D.

Mass. 2020). The disparity is not as extreme here, but the point is the same. How can the market rate for antitrust attorneys be 33% when—even aside from bids where Hagens Berman asks for less than half of that—co-lead Class Counsel regularly seek work in a jurisdiction with an *ex ante* expectation of a 25% fee or less in big cases? If the local toy store consistently has a 30%-off sale on $50 Darth Vader action figures, one can't say that the $50 list price is the "market rate" for Darth Vader action figures. (At best, it is a "Manufacturer's Suggested Retail Price." *Cf.* 16 C.F.R. § 233.3.)

If the national market rate for complex antitrust litigation were truly 33%, Class Counsel would not deign to litigate antitrust cases in the Ninth Circuit. The opportunity cost would be in the tens of millions. Plaintiffs' firms would not forum-shop antitrust cases into Ninth Circuit district courts. *E.g.*, Alison Frankel, *The fight is on for control of RealPage antitrust litigation*, Reuters (Jan. 10, 2023). The market rate, absent record or empirical evidence that the Seventh Circuit is riskier or more expensive to litigate in than the Ninth Circuit,[6] cannot possibly be materially above the Ninth Circuit's 25% benchmark, and is likely well below that in a case of this scale.[7]

---

[6] Neither the expert reports nor the Berman declaration make this claim. The dog did not bark. *Cf. Johnson v. Acevedo,* 572 F.3d 398, 401 (7th Cir. 2009) (citing Holmes, S.).

[7] Andren used shorthand in his discussion of the megafund rule when he said that "the Seventh Circuit effectively has a similar rule." OB37. Plaintiffs criticize this. PB34. Of course, the Seventh Circuit expressly rejected applying a *mechanical* megafund rule with an arbitrary cut-off, and so is different from the Ninth Circuit in that regard (although the Ninth Circuit doesn't really have such a mechanical megafund rule itself, as *Lithium* shows). But the Seventh Circuit's endorsement of monotonically decreasing percentages at the margin is, *de facto*, a more economically and mathematically sophisticated version of the megafund rule. "[N]egotiated fee agreements regularly provide for a recovery that increases at a decreasing rate." *Silverman*, 739 F.3d at 959; *see also id.* ("It is accordingly hard to justify awarding counsel as much of the second hundred million as of the first."); *Stericycle*, 35 F.4th at 561 (calling declining percentages

Andren made this argument below. *E.g.*, A89; A148; *cf.* A169. The district court ignored it. Andren raised this error on appeal. OB36-40. Awarding less than 33% would not deter plaintiffs' firms from bringing antitrust litigation, because such firms happily bring antitrust litigation in the Ninth Circuit, where 33% is uncommon. (Neither the Klonoff nor Fitzpatrick declarations try to reconcile their definition of "market rate" with these basic facts. A57; SA4. Andren noted this discrepancy, and how it made the expert reports unreliable, A154, and the district court ignored that, too.) Plaintiffs do not dispute that dozens of their fee requests are below 30%, including in settlements smaller than this one. OB36.

In response to this common-sense economic argument, plaintiffs say... nothing. Plaintiffs don't contend that Andren's reasoning is wrong (forfeiting any claim otherwise). They don't contend that the district court performed different economic reasoning. They simply argue that the district court has the discretion to disregard the argument entirely. Plaintiffs ask for deference to a district court that gave no reasons for rejecting this argument, or even any acknowledgment that the court considered the undisputed economic reasoning. Class members objecting to fees are entitled to consideration and a "reasoned response" to their nonfrivolous objections. *Johnson v. NPAS Solutions, LLC*, 975 F.3d 1244, 1262 (11th Cir. 2020); *see generally Golan v. Saada*, 142 S. Ct. 1880, 1893 (2022).

*Of course* out-of-circuit fee awards and proposals are relevant to the market rate for a national practice. *Synthroid I* itself considers them, and the district court got

---

"widespread practices"); *Synthroid II*, 325 F.3d at 975 ("market rate, as a percentage of recovery, likely falls as the stakes increase"); *accord Synthroid I*, 264 F.3d at 721. Andren stands by his statement that "the Seventh Circuit effectively has a similar rule" to the Ninth Circuit's inconsistently enforced megafund rule, though his assertion would have been more persuasive if he had included this footnote.

Seventh Circuit law by claiming that *Synthroid I* required it to disregard them. *Compare* A12 with 264 F.3d at 721 (citing declining scales used in two N.D. Cal. cases).

The district court's failure to consider out-of-circuit data is independent reversible error.

### III.  The district court's reliance on expert reports plaintiffs neither submitted nor noticed to the class violated *Redman* and Rule 23(h).

Plaintiffs do not dispute that Rule 23(h) and Seventh Circuit law requires that objectors know the basis of the attorneys' fee motion so that they can have a meaningful opportunity to object. *Redman v. RadioShack Corp.*, 768 F.3d 622, 637 (7th Cir. 2014); *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993-95 (9th Cir. 2010). Plaintiffs cite none of these rules or precedent.

Plaintiffs do not deny that the expert reports were not noticed to the class before the objection deadline, and that they did not seek to rely on expert witnesses they had not retained. OB8; OB40.

Plaintiffs do not dispute that Fitzpatrick and Klonoff failed to evaluate any of the Hagens Berman proposals in their analyses, and issued plainly erroneous expert opinions premised on the nonexistence of these bids. OB41.

Plaintiffs try to recharacterize this as a discovery dispute. PB35. Not so. The question presented (OB3) is whether it is an abuse of discretion to "repeatedly credit[] purported expert opinions submitted by other parties for an earlier fee request for a different class settlement that class members in this settlement were given no notice of and no opportunity to test in discovery." It is, which is why plaintiffs try to turn this into a discovery dispute. Andren simply notes that the district court was obligated to avoid the unfair prejudice, be it by permitting discovery or disregarding the expert reports entirely. But the district court simply neither acknowledged Andren's objections to the use of the experts nor ruled on Andren's request for procedural protections.

After the November 10 objection deadline, the first notice Andren had that the district court *might* rely on bogus expert reports was the Direct Purchaser fee order on November 30. By plaintiffs' lights, Andren should have immediately filed briefing about substantively responding to expert reports filed by other parties that were unmentioned in class counsel's fee motion and that the district court had no basis to rely on. Of course that isn't so, and Andren would violate 28 U.S.C. § 1927 if he filed substantive briefing on every speculative hypothetical improper use of evidence outside of party presentation.

Andren did, in an abundance of caution, file procedural briefing December 17 addressing the status of the experts before the December 20 fairness hearing. He objected to the district court considering the expert reports at all. A154. (Plaintiffs thus misstate the record when they assert (PB37) that Andren did "not oppose drawing on the experts' empirical research." Andren's filing flagged the putative experts' unexplained disregard of well-documented *ex ante* fee arrangements as a reason to distrust their purported empirical analysis. OB41. Garbage in, garbage out.)

Andren asked for the opportunity to depose the experts if the district court planned to rely on them. A154. Plaintiffs assert (PB36) that Andren failed to show the discovery would be material, but this is wrong. Andren's offer of proof noted that the experts

> did not consider the information that complete answers to
> Andren's interrogatories would provide; depositions of the experts
> would demonstrate this, and demonstrate that their opinions in this
> case are not reliable because they ignore the best evidence of
> market rate as the Seventh Circuit defines it

and were opining on a concept of "market rate" that materially differed from the Seventh Circuit definition. A154. Andren demonstrated that the experts' assumptions

were implausible, biased, or flat out wrong. As Andren highlighted, Fitzpatrick ignored that declining scales and fee grids are negotiated *ex ante* (OB41), and that rival firms vied for appointment in this case (OB42), yet erroneous statements landed in the fee order without addressing Andren's objections. OB42.

Plaintiffs note (PB35-PB36) that ten months passed between this filing and the fee order where Andren could have made additional filings, but the district court never acknowledged Andren's filing, so Andren had no reason to supplement it. The district court did not mention the experts at the fairness hearing. The district court's order on discovery did not mention expert witnesses, or suggest it planned to rely on them. A1-A3. The district court never denied Andren's objection to considering the experts— even in the final fee order itself. For all Andren knew, the district court would follow the law and ignore material that the moving party didn't even cite. The only thing in the record about the experts for *this fee motion* was Andren's citation to the peer-reviewed Fitzpatrick empirical study that, unbeknownst to Andren, the Fitzpatrick report-for-money contradicted. A94. Plaintiffs' proposed rule of decision would require objectors (indeed, litigants in general) to waste judicial resources on speculative substantive filings on matters no party raised.

*Dennison* is not to the contrary. *Dennison v. MONY Life Ret. Income Sec. Plan for Emps.*, 710 F.3d 741, 746 (7th Cir. 2013). *Dennison* has nothing to do with objectors and expert witnesses; rather, named plaintiffs in an ERISA case wanted a wide-ranging fishing expedition.

But there's no risk of abusive discovery when it comes to expert depositions. Fed. R. Civ. Proc. 26(b)(4)(E) requires the party seeking discovery to *pay for the expert's time*. (And experts not infrequently charge treble rates for deposition time precisely because they are at no risk of offending their client for doing so.) An objector has no incentive to make a bad-faith request to depose an expert. The protections of Rule 26(b)(4)(E) plus

the fact that Rule 23(h) contemplates *some* objector discovery (*Redman*, 768 F.3d at 638)
mean that this Court should reject Plaintiffs' implicitly proposed rule of decision (PB36)
that an objector can *never* depose an expert, no matter how deserving of scrutiny or
baseless the opinion.

But Andren's requested expert depositions were a second-best option to
Andren's disregarded request that the district court follow *Redman*, basic due process,
and rules of party presentment, and not rely on the expert reports at all. *Cf. United States
v. Sineneng-Smith*, 140 S. Ct. 1575 (2020). The district court relied on the expert reports
and its earlier decision for different parties. "The objectors" were "handicapped by not
knowing the rationale that would be offered for the fee request… There was no excuse
for permitting so irregular, indeed unlawful, a procedure." *Redman*, 768 F.3d at 638.

Plaintiffs embrace this fundamental unfairness of relying on unnoticed non-party
submissions, turning it on its head to argue that "awarding Class Counsel a lower fee
than counsel for the direct-purchaser and commercial classes would be fundamentally
illogical." PB21. The Court must reject that argument. Andren would have been
sanctioned if he had tried to file an objection to the Direct Purchaser Class fee request
without being a class member; he would have had no appellate standing to appeal that
fee order. *Cf. Silverman*, 739 F.3d at 957. While non-parties may assert collateral estoppel
in some cases, they may not do so against other non-parties who had no opportunity to
litigate. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 (1987).

The court simply relies on the experts' reports with almost verbatim language
from the reliance in the first fee order—though the experts never opined on plaintiffs'
fee request. And not just for the experts' faulty "empirical" evidence that ignored the
*Optical Disk* and *Lithium* bids and plaintiffs' discovery responses, but for the erroneous
legal proposition that out-of-circuit cases are "infected" by the megafund rule and don't

count for the Seventh Circuit's market-mimicking analysis. *Compare* A11 *with* Section II above; OB25.

The district court's fee order never addresses any of Andren's procedural or substantive objections to the experts; the district court never expressly addressed Andren's request for relief in the alternative; the discovery order mentions experts not at all. Andren did not know the district court would rely on the expert reports until the fee order issued, though the district court had ten months to respond to Andren's objection.

The district court's reliance on the experts is thus riddled with reversible procedural and substantive error. This alone is independent reversible error.

## Conclusion

The fee award should be vacated, and the case remanded to determine an appropriate fee award based on hypothetical *ex ante* market rates. This Court should further instruct that, if courts do rely on past fee awards as data points, they should not arbitrarily gerrymander the sampling of those awards. On remand, the district court should not rely on evidence submitted by non-parties and challenged by objectors without permitting discovery.

Dated:  February 22, 2023        Respectfully submitted,

                                      HAMILTON LINCOLN LAW INSTITUTE
                                      CENTER FOR CLASS ACTION FAIRNESS

                                      */s/ Theodore H. Frank*
                                      Theodore H. Frank
                                      1629 K Street, NW, Suite 300
                                      Washington, DC 20006
                                      (703) 203-3848
                                      ted.frank@hlli.org

                                      M. Frank Bednarz
                                      1440 W. Taylor Street, #1487
                                      Chicago, IL 60607
                                      (801) 706-2690
                                      frank.bednarz@hlli.org

                                      *Attorneys for Objector-Appellant*
                                         *John Andren*

**Certificate of Compliance with Fed. R. App. P. 32(a)(7)(C)**

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, Type Style Requirements, and Appendix Requirements:

1.        This brief complies with the type-volume limitation of Cir. R. 32(c) because:

This brief contains 6,185 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.        This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 12-point Palatino Linotype font.

3.        All materials required by Cir. R. 30(a) & (b) are included in the appendix.


Executed on February 22, 2023

/s/ *Theodore H. Frank*
Theodore H. Frank

**Proof of Service**

I hereby certify that on February 22, 2023, I caused to be electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Seventh Circuit using the CM/ECF system pursuant to Cir. R. 25(a), thereby effecting service on all counsel of record, who are registered for electronic filing.

/s/ *Theodore H. Frank*
Theodore H. Frank